*United States v. Compton*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2015

ARGUED: FEBRUARY 24, 2016
DECIDED: JULY 19, 2016

No. 15-942

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

PETER COMPTON,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Northern District of New York.
No. 8:13-CR-405 – Norman A. Mordue, *Judge.*

————

Before: WALKER, RAGGI, and HALL, *Circuit Judges.*

————

Defendant-Appellant Peter Compton appeals from the judgment of the United States District Court for the Northern District of New York (Mordue, *J.*) denying his motion to suppress

145 pounds of marijuana discovered in his vehicle by United States Border Patrol ("Border Patrol") agents. Compton argues that the agents seized him and searched his vehicle in violation of his Fourth Amendment rights. We agree with the district court that the agents had reasonable suspicion to conduct a *Terry* stop of Compton, *see Terry v. Ohio*, 392 U.S. 1 (1968), and that the agents did not unreasonably extend the stop. Accordingly, we AFFIRM the district court's judgment denying the motion to suppress the physical evidence.

————

MOLLY K. CORBETT, Research & Writing Attorney (Paul J. Evangelista, Assistant Federal Public Defender, *on the brief*), for Lisa A. Peebles, Federal Public Defender for the Northern District of New York, Albany, NY, *for Defendant-Appellant*.

STEVEN D. CLYMER, Assistant United States Attorney (Katherine Kopita, Assistant United States Attorney, *on the brief*), for Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-Appellant Peter Compton appeals from the judgment of the United States District Court for the Northern District of New York (Mordue, *J.*) denying his motion to suppress

145 pounds of marijuana discovered in his vehicle by United States Border Patrol ("Border Patrol") agents. Compton argues that the agents seized him and searched his vehicle in violation of his Fourth Amendment rights. We agree with the district court that the agents had reasonable suspicion to conduct a *Terry* stop of Compton, *see Terry v. Ohio*, 392 U.S. 1 (1968), and that the agents did not unreasonably extend the stop. Accordingly, we AFFIRM the district court's judgment denying the motion to suppress the physical evidence.

## BACKGROUND

On August 22, 2013, at approximately 7:30 a.m., Border Patrol agents set up an immigration checkpoint near the Canadian border on State Route 11 in Chateaugay, New York. Approximately .5 miles west of the checkpoint, at the crest of a hill and on the north side of the road, there was a vegetable stand. The stand was "not manned" and only "[i]ntermittently active." App. 61, 79. Shortly before passing the vegetable stand, eastbound drivers coming over the hill would be able to see for the first time the vegetable stand and a sign alerting them to the checkpoint.

At approximately 8:00 a.m., Compton and his brother were traveling eastbound on Route 11 in their mother's green Ford sport utility vehicle ("SUV"). Compton sat in the front passenger seat while his brother drove.

Border Patrol Agent David Gottschall had parked his marked Border Patrol vehicle on the north side of Route 11, facing the road, between the checkpoint and the vegetable stand. From this position—approximately .35 miles west of the checkpoint and approximately .15 miles east of the stand—Gottschall could monitor eastbound traffic through his passenger side window. He observed Compton's SUV come over the crest of the hill, abruptly slow down, and veer into the U-shaped driveway of the vegetable stand.

Gottschall then received a telephone call from fellow Border Patrol Agent Daniel Taylor, who was stationed at the checkpoint. Taylor told Gottschall that a motorist entering the checkpoint had just reported that the SUV had passed her vehicle and then immediately slowed down upon reaching the crest of the hill.

After receiving the call from Taylor, Gottschall drove to the vegetable stand and parked behind the SUV. The SUV was unoccupied. He then saw Compton and his brother walking away from the vegetable stand approximately fifteen to twenty feet apart from one another. Each of the two men held a pint of peppers.

Gottschall ordered Compton and his brother to return to their vehicle, where he began to question them. Gottschall asked the men for identification and tried to find out why they had turned off the road so abruptly. Gottschall then walked back towards his Border Patrol vehicle, intending to run checks on the brothers' identities

and the SUV's license plate. As he passed the rear seat of the SUV, he noticed a blanket in the back that appeared to be concealing something. Gottschall later testified at the suppression hearing that, in his experience, "blankets are commonly used to conceal humans," to "conceal cigarettes" or, more generally, "to prevent the plain view observation of law enforcement." App. 62.

Suspecting that the blanket in the SUV "either concealed humans or narcotics or something to that effect," *id.*, Gottschall contacted Taylor and asked him to bring a canine to the SUV. Taylor brought his canine, Tiko, to the SUV in less than a minute.

Gottschall and Taylor informed the brothers that the Border Patrol would be performing a canine sniff, removed the brothers from the SUV, and led Tiko around the SUV. The canine sniff took no more than five minutes, and during this time Compton and his brother sat handcuffed inside separate Border Patrol vehicles.

Tiko alerted at the SUV's rear door. After Taylor opened the door, Tiko entered the SUV and alerted to four duffle bags. The Border Patrol agents then informed Compton and his brother that they were under arrest. The Border Patrol later found that the four duffel bags contained approximately 145 pounds of marijuana.

On October 23, 2013, a grand jury indicted Compton and his brother on two counts. Count One charged the brothers with conspiracy to possess with intent to distribute and to distribute 100

kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged the brothers with possession with intent to distribute 50 kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1).

On May 1, 2014, Compton moved to suppress statements as well as physical evidence obtained during the stop and seizure. He argued that the Border Patrol had lacked reasonable suspicion to detain him and had extended the detention unreasonably. He also argued that, when the agents handcuffed him and placed him in a Border Patrol vehicle during the canine sniff, the detention became an arrest without probable cause.

On September 9, 2014, following an evidentiary hearing, the district court issued a decision and order denying the motion as to the physical evidence. The district court rejected Compton's arguments as to the lack of reasonable suspicion and unreasonable length of detention. The district court agreed that the detention became an arrest without probable cause but determined that, because the Border Patrol would have discovered the marijuana without the arrest, the drugs did not need to be suppressed as fruit of the poisonous tree.

On October 30, 2014, Compton and the government entered into a conditional plea agreement in which Compton agreed to plead guilty to Count Two of the indictment and both parties agreed

that he reserved his right to appeal the district court's decision not to suppress the physical evidence.

On March 6, 2015, the district court dismissed Count One of the indictment on the government's motion and sentenced Compton to thirty months of imprisonment followed by three years of supervised release. On March 30, 2015, Compton filed a timely notice of appeal.

## DISCUSSION

Compton argues on appeal that Gottschall lacked reasonable suspicion to detain him at the vegetable stand and that Gottschall unreasonably extended the detention to perform the canine sniff, errors that tainted his subsequent arrest and the vehicle search, requiring the suppression of evidence obtained from the search. We disagree.

### I.    Reasonable Suspicion

We review de novo a district court's reasonable suspicion determination. *Ornelas v. United States*, 517 U.S. 690, 691 (1996). "The factual findings underlying that determination must be accepted unless clearly erroneous." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008); *United States v. Bershchansky*, 788 F.3d 102, 109 (2d Cir. 2015).

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As this language indicates, the ultimate measure of the constitutionality of a government search or seizure is reasonableness." *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014) (internal quotation marks omitted). Reasonableness is "generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action." *Id.*

Under the Fourth Amendment, an officer may conduct a brief investigatory detention (commonly known as a "*Terry* stop") as long as the officer has reasonable suspicion "that the person to be detained is committing or has committed a criminal offense." *Id.* at 332 (internal quotation marks omitted); *see Terry*, 392 U.S. at 30.

Reasonable suspicion requires more than an "inarticulate hunch[]." *Terry*, 392 U.S. at 22. The suspicion must derive from "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Bailey*, 743 F.3d at 332 (internal citation and quotation marks omitted).

In assessing the reasonableness of an officer's suspicion, we must take into account "the totality of the circumstances" and must "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and

training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted); *see United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[T]he evidence . . . collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").

Here, the district court properly rejected Compton's argument that Gottschall lacked reasonable suspicion to detain him at the vegetable stand. Gottschall's suspicion was reasonable due to the combination of (1) the brothers' avoidance of the checkpoint, (2) the checkpoint's proximity to the border, and (3) the brothers' peculiar attempt to conceal the avoidance.

**A. Avoidance of the Checkpoint**

The district court did not commit clear error in finding that the SUV avoided the checkpoint, and the district court properly determined that avoidance to be a factor supporting the reasonableness of Gottschall's suspicion.

**1. Absence of Clear Error**

We easily reject Compton's argument that the district court never made a factual finding that the SUV avoided the checkpoint. The district court expressly included "the SUV's avoidance of the checkpoint" in a list of the "objective facts" supporting Gottschall's reasonable suspicion. App. 145. We review this factual finding for clear error. *See Padilla*, 548 F.3d at 186.

We find no clear error here. Gottschall testified that he observed the SUV immediately slow down at the crest of the hill—the exact point at which an eastbound driver would first be able to see the checkpoint—and veer abruptly into the vegetable stand. Gottschall further testified that he then received a call from a fellow agent and learned that a motorist had reported that the SUV had passed her before suddenly slowing at the crest of the hill. This evidence supports the district court's finding that the occupants of the SUV performed an intentionally evasive maneuver to avoid the checkpoint at the moment it came into view.

Compton's evidentiary challenges warrant no different conclusion. His argument that the district court inappropriately construed the abrupt turn as evasive—insofar as the SUV did not immediately drive away in the opposite direction—fails because Gottschall testified that, although many "turnarounds" did involve sudden U-turns, other drivers would frequently pull into a location "and simply sit there and wait." App. 89. Compton's challenge to the reliability of the motorist's report is also misguided: the motorist provided an account of an event she had just observed, *see Navarette v. California*, 134 S. Ct. 1683, 1689 (2014) (observing that a contemporaneous report of a traffic incident based on personal knowledge was "especially reliable"); her description of the SUV was corroborated by Gottschall's personal observations, *cf. United*

*States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007) (stating that, while "even a completely anonymous tip could support a finding of probable cause with a sufficient degree of corroboration," the extent of corroboration needed to support reasonable suspicion "is obviously less"); and she reported her observation to a law enforcement official in person, *cf. Navarette*, 134 S. Ct. 1689-90 (relying on ability of authorities to identify 911 callers to justify reliance on information reported). Nor does Compton's emphasis on the number of possible "innocent" explanations for the abrupt turn establish clear error. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.").

### 2. Avoidance and Reasonable Suspicion

Avoidance of a checkpoint alone is probably insufficient to establish reasonable suspicion. *See United States v. Murphy*, 703 F.3d 182, 192 n.7 (2d Cir. 2012). Motorists may intentionally avoid a checkpoint for any number of reasons unrelated to criminal activity. *See United States v. Ogilvie*, 527 F.2d 330, 331-32 (9th Cir. 1975). For example, some may wish to "avoid the inconvenience and delay of being stopped." *United States v. Yousif*, 308 F.3d 820, 828 (8th Cir. 2002). Others may find checkpoints stressful and prefer to avoid interactions with law enforcement when possible.

Avoidance of a checkpoint is, however, a factor that can support a finding of reasonable suspicion when combined with other relevant circumstances. A number of our sister circuits have so held, *see, e.g., United States v. Smith*, 396 F.3d 579, 585-86 (4th Cir. 2005); *United States v. Montero-Camargo*, 208 F.3d 1122, 1139 (9th Cir. 2000) (*en banc*); *United States v. Duguay*, 93 F. 3d 346, 350-51 (7th Cir. 1996), while our own court has reached this conclusion summarily, *see United States v. Sanders*, 208 F.3d 204 (2d Cir. 2000). Indeed, this is consistent with Supreme Court precedent holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and that an officer may base such a determination in part on an individual's "unprovoked flight upon noticing the police." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Flight from or intentional avoidance of law enforcement "is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.*

The district court thus properly characterized the SUV's avoidance of the checkpoint as one of multiple factors supporting Gottschall's reasonable suspicion.

**B.  Proximity to the Border**

The checkpoint's proximity to the border also supported Gottschall's reasonable suspicion. The Supreme Court has held that, as part of a reasonable suspicion determination, "[o]fficers may consider the characteristics of the area in which they encounter a

vehicle," including "[i]ts proximity to the border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975); *accord United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). This is so because national borders uniquely implicate various criminal activities—including contraband smuggling, *see, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 537-39 (1985), and illegal entry, *see, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 551-53 (1976); *Brignoni-Ponce*, 422 U.S. at 878-79.

Compton argues that the court could not rely on the proximity of the border in this case because the government failed to establish that proximity before the district court. This argument fails because the government did present evidence establishing proximity. Gottschall testified that he was "working an immigration checkpoint," which is a checkpoint set up "to capture anything that's crossing the border or any criminal activity in the area." App. 51. He testified further that he called the checkpoint the "State Route 11 checkpoint," and that, "[i]t's in Chateaugay." App. 71. In Compton's declaration in support of his motion to suppress, moreover, Compton confirms that at the time of the encounter with the Border Patrol, he was "traveling along route 11 in Chateaugay, New York." App. 28. It is beyond peradventure that the town of Chateaugay, New York, is on the U.S.-Canadian border—a fact that we may judicially notice, *see*, Fed. R. Evid. 201(b)(1) & (2), and one

recognized by the district court when it took "into account . . . the checkpoint's proximity to the border." App. 145. The district court did not err in considering that proximity in its reasonable suspicion analysis.

### C. Peculiar Concealment Attempt

A third circumstance supporting Gottschall's reasonable suspicion was his observation of the peculiar circumstances surrounding the precipitous pepper purchase. When Gottschall pulled up to the vegetable stand at 8:00 a.m., he saw the two brothers walking back to their car at a significant distance from one another, each holding a small packet of peppers.

Because Gottschall had already determined that the SUV had made the abrupt turn into the vegetable stand in order to avoid the checkpoint, Gottschall could reasonably interpret the pepper purchase to be an attempt to conceal that avoidance. He could reasonably discount the probability of an alternate explanation, such as a sudden pepper emergency (such predicaments occur infrequently) or a simple desire to avoid a delay (taking the extra time to park a car and go shopping is hardly consistent with a motorist who avoids a checkpoint because he or she is in a hurry). And he could reasonably be suspicious of individuals who appeared to be taking steps to actively deceive law enforcement.

Moreover, the improbability of a pepper emergency occurring immediately upon the appearance of a border checkpoint rendered the brothers' ruse even more suspicious. A person who resorts to an odd and poorly conceived concealment measure to avoid contact with law enforcement authorities is more likely to be desperate to avoid detection of unlawful activity.

Accordingly, the avoidance of the checkpoint, the proximity of the checkpoint to the border, and the rather peculiar attempt to conceal the avoidance of the checkpoint together constituted a sufficient basis for Gottschall's reasonable suspicion and for the ensuing *Terry* stop.

**II.    Reasonable Extension**

Although we have determined that reasonable suspicion justified Gottschall's *Terry* stop of Compton at the vegetable stand, we must still determine whether Gottschall's "actual conduct fell within the permissible scope of a *Terry*-type detention." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992).

A *Terry* stop initially justified by reasonable suspicion may still violate the Fourth Amendment if it is extended unreasonably. This is because, "[i]f an investigative stop based on reasonable suspicion continues too long . . . , it will ripen into a *de facto* arrest that must be based on probable cause." *Id.*  Although the Fourth Amendment places "no rigid time limitation on *Terry* stops," *United*

*States v. Sharpe*, 470 U.S. 675, 685 (1985), "the detention can continue only for the period of time necessary to either verify or dispel the suspicion," *United States v. Watson*, 787 F.3d 101, 105 (2d Cir. 2015) (internal quotation marks and alteration omitted).

Here, the district court properly rejected Compton's argument that Gottschall unreasonably extended the *Terry* stop. Compton maintains on appeal that Gottschall extended the stop in violation of the Fourth Amendment when he ordered Compton and his brother back into the SUV. Compton's argument fails for two reasons: (1) the *Terry* stop did not actually begin until Gottschall ordered the brothers back into the SUV, and (2) the stop was reasonable in duration from that point on.

**A. Beginning of the Stop**

During a consensual encounter, "officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identification and permission to inspect luggage." *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996). A consensual encounter becomes a *Terry* stop when "under the circumstances, a reasonable person would have believed that he was not free to leave." *Id.* (internal quotation marks omitted).

We reject Compton's argument that the *Terry* stop began as soon as Gottschall arrived at the vegetable stand. Gottschall testified that, upon arrival, he pulled his Border Patrol vehicle in behind the

SUV in the U-shaped driveway and turned on his lights "for safety reasons." App. 82. Gottschall then saw the Comptons emerge from the stand, addressed them, and asked them twice to return to the SUV (the second request following the brothers' refusal of the first). Because the driveway was U-shaped, Gottschall's car did not block the SUV's egress from the vegetable stand, and he took no other action to restrain the brothers' movement. A reasonable person would thus have believed that he was not free to leave only at the point when Gottschall requested him to return to the SUV. (The brothers' initial refusal suggests that, even at that point, they themselves may still have felt free to leave.) Accordingly, we conclude that a consensual encounter began when Gottschall pulled up to the vegetable stand and that the encounter became a *Terry* stop only when Gottschall ordered the brothers back into the SUV. *Cf. Tehrani*, 49 F.3d at 58 (recognizing that a police encounter remains consensual "so long as the police do not convey a message that compliance with their requests is required" (internal quotation marks omitted)).

## B. Duration of the Stop

If an investigation conducted during an initial stop "enhance[s] suspicion[] of . . . criminal activities," an officer may extend the stop in order "to confirm or dispel" that enhanced suspicion. *See Bailey*, 743 F.3d at 336-37.

Here, after ordering the brothers into the SUV, Gottschall saw a blanket that "appeared to be concealing some objects" in the back of the car. App. 62. *See United States v. Aldaco*, 168 F.3d 148, 149 (5th Cir. 1999) (discussing the suspicious nature of "bulky objects covered with blankets in the back of the vehicle," later determined to be concealing 503 pounds of marijuana). Gottschall's professional experience led him to suspect that the blanket concealed humans, cigarettes, narcotics, or "something to that effect." App. 62. We agree with the district court that Gottschall reasonably extended the stop in order to confirm or dispel this enhanced suspicion.

Gottschall conducted the extended investigation with reasonable promptness. He radioed Taylor, who arrived with the canine in under a minute. The canine sniff that confirmed the presence of narcotics took no more than five minutes. The Fourth Amendment permits a brief extension of a *Terry* stop in order to conduct a canine sniff to resolve suspicions enhanced during the initial stop.

The fact that the agents placed the brothers in separate police vehicles and handcuffed them during the brief canine sniff does alter our analysis. Compton has abandoned his argument that his handcuffing constituted an arrest without probable cause requiring suppression of the physical evidence under the fruit of the poisonous tree doctrine. *See United States v. Cacace*, 796 F.3d 176, 188

(2d Cir. 2015). Moreover, because the Border Patrol would have discovered the marijuana without placing the brothers in handcuffs in separate vehicles, the reasonableness of the agents' actions is not relevant to the admissibility of the physical evidence.

Accordingly, we find that Gottschall conducted a *Terry* stop of Compton that was both justified by reasonable suspicion and extended for a reasonable duration.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment denying the motion to suppress the physical evidence.