DENNIS JACOBS, Circuit Judge:
Plaintiff-Appellee Gregory A. Grice, III, a 16 year old train enthusiast, was stopped and handcuffed after the Greenburgh Police Department received a 911 report that someone holding an electronic device was *165 bending down by the tracks at a rail crossing. After a search of the tracks by the Metropolitan Transit Authority (“MTA”), the Greenburgh officers turned Grice over to the MTA officers, who detained him and charged him with trespass.
When the trespass charge was dismissed, Grice sued all concerned. The only remaining defendants are Sergeant Anthony McVeigh and Lieutenant Frank Farina of the Greenburgh police.. Grice alleges false arrest, failure to intervene, and failure to supervise. The United States District Court for the Southern District of New York (Román, J.) denied their motion for qualified immunity. On this interlocutory appeal, we reverse. It cannot be said that every reasonable officer in their circumstances would know that the conduct complained of violated clearly established law.
I
The facts are undisputed for the purpose of this appeal. Grice’s cellphone (set to record the trains) taped audio of his encounter with the police, and the two officers have (necessarily) agreed to accept Grice’s version of the facts. “Once a defendant asserting qualified immunity has agreed to be bound by the plaintiffs version of the facts, the issues become purely legal and we have jurisdiction over an interlocutory appeal from a denial of immunity.” Loria v. Gorman, 306 F.3d 1271, 1280 (2d Cir. 2002). Defendants may try to “evade their agreement by spinning the facts in their favor”; but we simply ignore any factual contentions that contradict the plaintiffs version of the facts. Id.
In the evening on June 6, 2011, Grice was lawfully watching trains at the Virginia Road railroad crossing in Greenburgh, New York. He was seen by a passing driver, Mary Andrachik, who told a 911 dispatcher that someone with a red shirt “was actually on the train tracks” and was holding “a little controller.” Joint App’x at 521-22. She said his behavior seemed “suspicious” and “bizarre.” Id. at 521. The dispatcher directed police units to investigate “a male white, wearing a red shirt bending down by the tracks with a remote control object in his hands” at “Virginia Road, by the train tracks crossing.” Id. at 524.
Sergeant Anthony McVeigh of the Greenburgh police arrived at the scene first, alone. A police officer since 1995, he was commander for some years of Green-burgh’s Special Operations Unit, which includes the SWAT team. Over the course of a year, he had received several briefings and bulletins about the possibility that terrorists would attempt to sabotage railroad tracks; about a month before the encounter with Grice, McVeigh received a circular on attempted rail sabotage in a nearby town.
When McVeigh arrived at the crossing, Grice was wearing a red shirt, was holding a camera, and was standing approximately 12-15 feet from the tracks, next to a barricade. A backpack was on the ground, and two electronic devices—one with an antenna—were next to him on top of the barricade. One device was a cell phone; the other, a radio scanner. The only deviation from the radioed description of Grice was his race: the dispatcher said he was white, while Grice is African-American.
McVeigh asked Grice what’he was doing, and seemed puzzled when Grice said he was taking pictures of the trains and listening to Metro North broadcasts. Grice told McVeigh that he had a letter from the MTA explaining that what he was doing was “okay.” Id. at 558. Grice then suggested that he or McVeigh could retrieve that letter from his backpack. But McVeigh was concerned that there might be a sabo *166 tage device that could' be activated remotely; so he told Grice a few minutes into their conversation, “Right now I’m going to cuff you for my safety and your safety ... Until I find out what’s going on here.” Id. at 559.
Lieutenant Frank Farina and several other Greenburgh police officers arrived shortly after. Grice explained to them that he was a “rail fan” who had watched the trains at Virginia Road several times. McVeigh responded:
We don’t know what you’re doing out here. It’s very unusual to do what you’re doing. We don’t get complaints like this ... You’re the first guy in my career that’s ever been sitting next to a train with a radio looking at trains and taking pictures!.]
Id. at 566-67.
MTA officers arrived approximately 15 minutes after McVeigh cuffed Grice. They began questioning Grice anew, and the tracks were searched for a bomb by officers and a dbg. When the search turned up nothing, McVeigh asked the MTA officers if he could "switch out his handcuffs with the MTA’s, and an MTA officer agreed. Grice was in McVeigh’s handcuffs for about 33 minutes.[1] When the involvement of McVeigh and Farina ended at this point, MTA officers took Grice to an MTA facility, placed him in' a cell, interrogated him, and gave him a summons for trespass. The trespass charge was ultimately dropped.
Grice sued several police officers and government entities, including the MTA, seeking damages for his handcuffing, arrest, and prosecution. He settled his claims against most of the defendants for a total of $24,000. Remaining are.claims for false arrest, failure to intercede, and supervisory liability against (variously) McVeigh and Farina. The district court denied the officers’ motion for summary judgment, and' they appeal, arguing that they are entitled to qualified immunity.
II
“Qualified immunity protects officials from' liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks omitted). Rights must be clearly established in a “particularized” sense, rather than at a high level of generality; and such rights are only clearly established if a court can “identify a case where an officer acting under similar circumstances” was held to have acted unconstitutionally. White v. Pauly, — U.S. -, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). The qualified immunity standard is “forgiving” and “protects all but the plainly incompetent or those who knowingly violate the law.” Amorev. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (internal citations omitted).
A. The Unlawful Arrest Claim Against McVeigh
Grice’s unlawful arrest claim fails because his handcuffing was an “investigatory detention” (otherwise known as a “Terry stop”) that never ripened into an arrest and was supported by reasonable suspicion. Police stops fall into two catego *167 ries: arrests and Terry stops. Arrests require probable cause, while a police officer may make a Terry stop “as long as- the officer has reasonable suspicion that the person to be detained is, committing or has committed a criminal offense.” United States v. Compton, 830 F.3d 55, 61 (2d Cir. 2016). The standard for reasonable suspicion is “not high,” and is less than what probable cause requires. United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (internal citation omitted). Whether an officer’s suspicion is “reasonable” is an objective inquiry based on the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training. United States v. Singletary, 798 F.3d 55, 60 (2d Cir. 2015).
McVeigh had reasonable suspicion to stop Grice, either for unlawful interference with a train or for trespass. N.Y. R.R. Law § 53-e; N.Y. Penal Law § 140.05. McVeigh had been ordered to look out for sabotage on the railroad. Less than a month earlier, he had received a training circular advising that someone had attempted to sabotage a railroad in nearby Patterson, New York, using “a homemade device, wrapped in black tape with a radio-control antenna affixed.” Joint App’x at 101. The dispatcher called in a tip from an observer that someone was “bending down by the tracks with a remote control object in his hands,” id. at 524, and McVeigh saw someone matching the observer’s description with various electronic devices, some more familiar than others;
McVeigh was unaware of any plausible innocent reason that could explain why someone would be taking photos of trains and listening to the railroad’s radio broadcasts. Grice told McVeigh he was a train buff and that he had received permission from the MTA to take photographs as long as he was not on MTA property, but McVeigh had never heard of trainspotting until the encounter at the railroad crossing. He was not required to credit an innocent explanation that seemed implausible given his knowledge at the time. “Suspicious circumstances may have innocent explanations; but the availability of an innocent explanation does not create an issue of fact as to.the reasonableness of the suspicion.” Holeman v. City of New London, 425 F.3d 184, 191 (2d Cir. 2005). McVeigh’s suspicion that Grice may have committed a crime was reasonable, and he was entitled to stop him to investigate.
A Terry stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the 'first place. Compton, 830 F.3d at 64; United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993). In general, to determine whether a Terry stop is so intrusive as to become an arrest, we look to:
the amount of force used by police, the need for such force, and-the extent to which the individual’s freedom of movement was restrained, and in particular such factors as the number of agents-involved,1 whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect,. including whether or not handcuffs were used.
Id. at 645 (internal punctuation and citations omitted).
Handcuffing is ordinarily not incident to a Terry stop, and tends to show that a stop has ripened into an arrest. But a police officer, “faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists.” United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990). In *168 certain unusual circumstances, we have therefore held that handcuffing a suspect to investigate a reasonable suspicion does not transform a Terry stop into an arrest. See, e.g., United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (handcuffing a potentially armed suspect to search him for a firearm was not an arrest); United States v. Vargas, 369 F.3d 98, 102 (2d Cir. 2004) (“[Although under ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.” (internal punctuation omitted)). We ask if “police have a reasonable basis to think that the person detained poses a present physical threat and handcuffing is the least intrusive means to protect against that threat.” Bailey, 743 F.3d at 340.
These circumstances can easily be classified as unusual, McVeigh was on the lookout for railroad sabotage, received a report by police radio of an individual matching Grice’s description bending down by the tracks with a remote control device, and was unaware of a pastime that could explain the behavior that was observed. He therefore had reason to believe, suspect, and fear that Grice might use an electronic device to set off an explosive on the tracks. It was not unreasonable for a lone officer to handcuff Grice in order to ensure that Grice could not press a detonator button on any electronic device until the tracks could be searched.
McVeigh’s intent to handcuff Grice for protection rather than pursuant to arrest is clear: he never administered a Miranda warning, and he explained to Grice that he was handcuffing him “for my safety and your safety ... [u]ntil I find out what’s going on.” Joint App’x at 559. McVeigh released Grice from his handcuffs after the MTA finished its investigation of the tracks; and thirty-three minutes was not an unreasonable interval to keep the handcuffs on while officers and a dog searched the tracks for a potential bomb. United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) (“We decline to hold that a thirty minute detention based on reasonable suspicion is, per se, too long.”); see also United States v. Vega, 72 F.3d 507, 516 (7th Cir. 1995) (concluding that a Terry stop lasting 62 minutes was not a de facto arrest because “part of that 62 minutes consisted of waiting for the narcotics sniffing dog to arrive.”); United States v. Sharpe, 470 U.S. 675, 687 n.5, 105 (S.Ct. 1568, 84 L.Ed.2d 60)5 1985 (finding it reasonable for state patrolman to detain plaintiff pending federal agent’s arrival because “as a highway patrolman, he lacked [the agent’s] training and experience in dealing with narcotics investigations.”). Because McVeigh had an objectively reasonable suspicion to detain Grice, and because McVeigh’s detention of Grice did not ripen into an arrest, McVeigh is entitled to qualified immunity on the false arrest claim.
According to the dissent, it was obvious to the police that Grice was engaged in an innocent pastime: Grice’s explanation that he was “just taking pictures” was “a fact easily corroborated by the fact that Grice had a camera rather than a ‘remote control’ device ... or a bomb.” Dissent at 2. But Grice also had an electronic device with an antenna sitting on the barricade (which turned out to be a police scanner) as well as a cell phone. True, the use of a cell phone as a remote control detonator is not a feature promoted by manufacturers; at the same time, remote detonation of a bomb or improvised explosive device by cell phone is a standard technique for ter *169 rorists, as demonstrated in the margin.[2]
B. The Failure to Intercede Claim Against McVeigh and Farina
Grice argues that the defendants are liable for their failure to intervene with the MTA police officers to prevent Grice’s continued handcuffing. McVeigh and Farina, as officers of the Town of Greenburgh, had no evident authority over officers of the MTA, who serve in a separate hierarchy in a separate jurisdiction with particular responsibility for security of the railroad. In any event, MTA officers did not seem to be mistreating Grice, and could reasonably decide to interview Grice at the MTA facility. If McVeigh and Farina had a duty to intervene in those circumstances, that duty was not clearly established, and the defendants therefore enjoy qualified immunity on that claim. See Pauly, 137 S.Ct. at 552 (holding that law is clearly established only when a court can “identify a case where an officer acting under similar circumstances” was held to have acted unconstitutionally).
C. The Supervisory Liability Claim Against Farina
Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor and the subordinate both violate clearly established law. Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002). Since, as we have already ruled, McVeigh did not violate clearly established law, Farina is entitled to qualified immunity as well.
CONCLUSION
For the foregoing reasons, the order of the district court is reversed.

. The dissent argues that McVeigh advanced contradictory explanations for the handcuffs. First, he told Grice he was being handcuffed for safely, and then, after no bomb was found, kept him cuffed for trespassing. But McVeigh and Farina both made clear from the onset of their interaction with Grice that they believed that Grice had been on the MTA railroad tracks. So the two explanations do not contradict: if a bomb had been found, the trespass would not have been worth mentioning.

. A cell phone has been used as a detonator in virtually every recent attempted or actual bombing in the U.S. In New York; Ahmad Rahimi detonated multiple bombs in Manhattan and on the Jersey Shore using cell phones. See Compl. at 4, U.S. v. Rahimi, No. 16-cr-760 (S.D.N.Y. Sep. 20, 2016), ECF No. 1; see also Compl. at 20, U.S. v. Nafis, No. 12-cr-720 (E.D.N.Y. Oct. 17, 2012), ECF No. 1 (convicted terrorist attempted to bomb the Federal Reserve Bank in Manhattan using a cell phone as the detonator). Other relatively recent examples include the Boston Marathon Bombing and attempts in Washington, D.C., Dallas, Florida, and outside Chicago. About a month ago, the FBI arrested a man in Oklahoma City who attempted to blow up a vehicle containing a 1,000-pound ammonium nitrate bomb using a cell phone as the detonating device. See Compl. at 17, U.S. v. Varnell, No. 17-mj-368 (W.D. Okla. Aug. 13, 2017), ECF No. 1.