17-1222-cr
*U.S. v. Fiseku*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: June 7, 2018     Decided: October 4, 2018
Amended: December 17, 2018)

Docket No. 17-1222-cr

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

BEKIM FISEKU,

*Defendant-Appellant,*

SEFEDIN JAJAGA,

*Defendant.*[*]

B e f o r e :

CABRANES, LYNCH, and CARNEY, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the case caption to conform to the above.

Defendant-appellant Bekim Fiseku appeals from a judgment entered in the United States District Court for the Southern District of New York (Engelmayer, *J.*) convicting him of conspiracy to commit Hobbs Act robbery. Fiseku entered a conditional guilty plea after the District Court denied in part his motion to suppress physical evidence recovered during an investigatory stop. On appeal, he principally challenges that suppression ruling, arguing that the officers who apprehended him acted unreasonably by restraining Fiseku in handcuffs, thereby effectuating a de facto arrest without probable cause in violation of the Fourth Amendment. We disagree. As the District Court correctly determined, this case presents unusual circumstances that justify the use of handcuffs during an investigatory stop. Fiseku further argues that defense counsel was constitutionally ineffective in failing to assert a particular argument contesting Fiseku's status as a "career offender" under the United States Sentencing Guidelines. Following our usual practice, we decline to adjudicate Fiseku's ineffective assistance claim in this appeal, without prejudice to its renewal in a collateral proceeding.

AFFIRMED.

---

ROBERT ALLEN, Assistant United States Attorney (Won S. Shin, Assistant United States Attorney, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

MARY ANNE WIRTH, Bleakley Platt & Schmidt, LLP, White Plains, NY, *for Defendant-Appellant*.

---

SUSAN L. CARNEY, *Circuit Judge*:

Defendant-appellant Bekim Fiseku entered a conditional plea of guilty to one count of conspiracy to commit Hobbs Act robbery after the United States District Court for the Southern District of New York (Engelmayer, *J.*) denied in part his motion to suppress evidence recovered during an investigatory stop. *See United States v. Fiseku* ("*Suppression Order*"), No. 15 CR 384, 2015 WL 7871038 (S.D.N.Y. Dec. 3, 2015). On

2

appeal, Fiseku challenges that denial, and also asserts that defense counsel was constitutionally ineffective in failing to make a particular argument contesting Fiseku's status as a "career offender" under the United States Sentencing Guidelines (the "Guidelines"). As to the suppression ruling, we agree with the District Court that the officers acted reasonably under the Fourth Amendment during the late-night investigatory stop, notwithstanding their decision to briefly restrain Fiseku and two other individuals in handcuffs before the officers developed probable cause to arrest. As to Fiseku's ineffective assistance claim, in accordance with our usual practice, we decline to address his argument on direct appeal, without prejudice to his renewal of the claim in a collateral proceeding. Accordingly, for the reasons set forth more fully below, we AFFIRM the District Court's judgment.

## BACKGROUND[2]

### I.    The investigatory stop

Fiseku and two other individuals were apprehended in the early hours of September 20, 2014, in Bedford, New York, a rural town in Westchester County. Sergeant Vincent Gruppuso of the Bedford Police Department was on duty that night, patrolling the streets in a marked patrol car. At approximately 1:15 a.m., Gruppuso saw a white Nissan Pathfinder stopped on a dirt pull-off. Gruppuso pulled up to the vehicle and had a short conversation with the driver, later identified as Sefedin Jajaga, who

---

[2] The account provided here is drawn from the documentary evidence and testimony adduced before the District Court in connection with Fiseku's motion to suppress. Where the evidence was contested or ambiguous, we defer to the District Court's findings of fact as set forth in its suppression ruling, except with regard to the precise order in which Fiseku and Jajaga were handcuffed in the moments following Officer Gruppuso's arrival in the parking lot, as described below.

appeared to be the only person in the car. Jajaga told Gruppuso that he lived in Staten Island and was in Bedford that night visiting a friend. He was on the pull-off, he explained, because the Pathfinder was having transmission trouble, and he was waiting for a friend who had agreed to bring a tow truck from Brooklyn.

Gruppuso drove on, but as he later testified, the situation "seemed suspicious," particularly because he knew that a nearby house was vacant while awaiting sale, making it a "prime target for . . . burglary." App'x 126–27. He decided to circle back and check on the vehicle. On his way back to the pull-off, Gruppuso encountered the Pathfinder driving on a nearby street, less than five minutes after the driver had complained of transmission trouble. Gruppuso followed the Pathfinder to a "park-n-ride" parking lot near the highway.

As he turned into the parking lot, Gruppuso saw the Pathfinder parked in the far corner of the lot, which was ringed by trees. He parked nearby and now observed three men in or near the Pathfinder: Jajaga sitting in the driver's seat, a second individual (later identified as a certain Hughes) sitting in the passenger seat, and a third (later identified as Fiseku) walking around the rear of the vehicle. Because Gruppuso drove into the parking lot only moments after the Pathfinder, there was not enough time for anyone to enter that vehicle without Gruppuso noticing, unless someone was "stand[ing] there ready to jump in the vehicle when it pulled in and stopped." App'x 158.

Gruppuso radioed from the parking lot at 1:25 a.m., asking for an additional unit to join him, then got out of his car and approached the Pathfinder. Two officers soon arrived in separate police cruisers. By that time, Gruppuso had already begun interacting with Fiseku: after examining Fiseku's driver's license, Gruppuso patted him down and found no weapons or contraband. Within moments, the officers directed

4

Jajaga to exit the Pathfinder, patted him down and handcuffed him, and handcuffed Fiseku.[3] The officers then directed Hughes to exit the vehicle, then patted him down and handcuffed him as well. Gruppuso testified at the suppression hearing that the three men were handcuffed for officer safety. The officers did not draw their guns, however, because "[t]here was no threat of *deadly* force at that time." App'x 170 (emphasis added).

The officers did not tell the men that they were under arrest, nor did they issue *Miranda* warnings; rather, they explained that the men "were being detained" while the officers investigated their suspicious activity. App'x 139. The men were then separated for individual questioning, a "common interview tactic," according to Gruppuso. App'x 137. Jajaga and Hughes were each seated, separately, in the back seat of patrol cars, while Fiseku remained standing outside.

Jajaga told Gruppuso that he had been able to get the Pathfinder started shortly after their conversation on the dirt pull-off. He then drove to the parking lot, he explained, to pick up Fiseku and Hughes, who had driven there in a separate car; the three men planned to travel together to a party in Waterbury, Connecticut. When Gruppuso expressed skepticism, Jajaga offered a different reason for being in Bedford at such a late hour: he had arranged a sexual encounter with a woman who lived there. When asked for additional details, however, Jajaga claimed he did not know the woman's name or where she lived.

---

[3] The District Court found that Gruppuso first handcuffed Fiseku, and then directed Jajaga to exit the vehicle, at which point Jajaga was handcuffed in the presence of all three officers. Gruppuso's testimony, however, conflicts with that account: as pointed out on Fiseku's petition for panel rehearing, Gruppuso testified that Jajaga was handcuffed "first." App'x 170. We issued this amended opinion to correct this error.

Hughes, like Jajaga, stated that the three men were en route to a party in Connecticut in two separate cars. His account diverged at that point, however: whereas Jajaga claimed that the three men intended to proceed from Bedford together in one car, Hughes claimed they stopped in Bedford only to stretch their legs and smoke a cigarette, after which the men got back into *separate* cars. Fiseku, too, mentioned a party in Connecticut, but, contrary to both Jajaga's and Hughes's accounts, he claimed that all three men had arrived in Bedford together in one car. When Gruppuso confronted Fiseku with that inconsistency, Fiseku "stopped talking." App'x 142.

After hearing all three accounts, Gruppuso returned to Jajaga and said he didn't believe Jajaga's story. When asked "if there was anything in the vehicle that shouldn't be there," Jajaga responded, "[N]o, you can look." *Id.* The officers searched the vehicle and found the following items: baseball caps and a sweatshirt bearing New York Police Department insignia, a gold "repo/recovery agent" badge on a lanyard, a stun gun, a BB gun "replicating" a Colt .45 pistol, a blank pistol "replicating" a .25 automatic, flashlights, walkie talkies, gloves, a screw driver, and duct tape. *Suppression Order*, 2015 WL 7871038, at *4.

The search was complete by 1:35 a.m., approximately ten minutes after Gruppuso first arrived in the parking lot. At that point, concerned about a possible home invasion, Gruppuso called in a request for additional units to help canvass the area. The canvass did not reveal any criminal activity.

## II.    Procedural history

On June 18, 2015, the Government filed a sealed indictment charging Fiseku and Jajaga with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951. In September 2015, Fiseku and Jajaga moved to suppress both the physical evidence recovered from the vehicle and certain statements they made to the

officers during the stop, asserting arguments under both the Fourth and Fifth Amendments. The District Court held a suppression hearing in October 2015, and then invited supplemental briefing, followed by oral argument.

On December 3, 2015, the District Court entered an order granting in part and denying in part the suppression motion. *Suppression Order*, 2015 WL 7871038. The court rejected defendants' argument that the officers effectuated a de facto arrest without probable cause in violation of the Fourth Amendment. *See id.* at *11. In the District Court's view, the officers' conduct—including their use of handcuffs—was reasonable in light of the circumstances of the late-night investigatory stop in a remote area. *See id.* Turning to defendants' arguments under the Fifth Amendment, the court concluded that defendants' statements must be suppressed because the officers subjected defendants to a custodial interrogation without providing *Miranda* warnings. *See id*. at *14–15 (finding inapplicable the "public safety" exception to *Miranda*'s requirements); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (requiring suppression of statements "stemming from custodial interrogation of the defendant unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"). The court declined, however, to suppress the physical evidence recovered from the vehicle, concluding that "Jajaga's consent to search the vehicle was voluntarily and freely given," notwithstanding the lack of *Miranda* warnings. *Suppression Order*, 2015 WL 7871038, at *18.

In November 2016, Fiseku entered a conditional guilty plea to the single count of conspiracy to commit Hobbs Act robbery. At the change-of-plea hearing, he allocuted that he conspired with others to rob a known narcotics trafficker in Bedford. Fiseku's plea agreement articulated the parties' consensus that, in light of his status as a career offender (as defined in Guidelines section 4B1.1), the applicable offense level would be

7

29, producing a stipulated advisory Guidelines sentencing range of 151 to 188 months' imprisonment. Fiseku agreed not to appeal or collaterally attack any sentence that fell within or below that stipulated Guidelines range, except that he reserved the right to assert two specific types of challenges: (1) a claim of ineffective assistance of counsel, whether on direct appeal or in a habeas proceeding; and (2) an appeal of the District Court's decision not to suppress the physical evidence recovered from the vehicle. The agreement further provided that, should Fiseku successfully appeal the suppression ruling, the Government would not oppose a motion to withdraw his plea.

Fiseku appeared for sentencing on April 12, 2017. The District Court adopted the Guidelines calculation in the plea agreement (including Fiseku's designation as a career offender) and sentenced him, principally, to 108 months' imprisonment. Fiseku timely appealed.

## DISCUSSION

In this appeal, Fiseku argues that the investigatory stop ripened into a de facto arrest when Officer Gruppuso restrained him in handcuffs, and therefore, that the Fourth Amendment compels suppression of the physical evidence recovered from the Pathfinder during that stop. We disagree, and so affirm the District Court's decision declining to suppress that evidence. Fiseku additionally asserts a claim of ineffective assistance of counsel, arguing that defense counsel was ineffective in failing to make certain arguments challenging the Government's proposed Guidelines calculation. We decline to reach this argument on direct appeal, without prejudice to its renewal in a future collateral proceeding where the record may be more fully developed.

## I. Fiseku's Fourth Amendment challenge

Fiseku maintains that the officers' use of handcuffs caused the investigatory detention to ripen into a de facto arrest without probable cause in violation of the Fourth Amendment. He contends, therefore, that the District Court erred in declining to suppress the physical evidence recovered during the investigatory stop as fruit of the poisonous tree.[4] *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). In appeals from denied suppression motions, we review factual determinations for clear error, but we review de novo conclusions of law and "[m]ixed questions of law and fact," including the ultimate determination of "whether the admitted or established facts satisfy the relevant statutory or constitutional standard." *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) (internal quotation marks omitted). We agree with the District Court's conclusion that the unusual circumstances of Fiseku's apprehension justified the brief use of handcuffs in this instance. We accordingly affirm the District Court's decision not to suppress the physical evidence under the Fourth Amendment.[5]

---

[4] Under the so-called "exclusionary rule," trial courts must generally "exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 136 S. Ct. 2056, 2059 (2016). The Supreme Court has recognized "several exceptions" to that rule, *see id*. at 2061, but the Government has not argued that any exception applies in this instance. Rather, the Government contends that the officers acted reasonably under the Fourth Amendment during the investigatory stop such that the exclusionary rule does not come into play.

[5] Fiseku also purports to challenge the District Court's conclusion that Jajaga's consent to search the Pathfinder was voluntarily given. But because Fiseku's argument amounts to a single paragraph bereft of any citation to applicable legal authority, we deem the point abandoned. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

A.    Legal standard: Investigatory stops and de facto arrests

The Fourth Amendment defines a right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Courts assess "reasonableness" in this context by "balancing the particular need to search or seize against the privacy interests invaded by such action." *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014).

While an arrest must generally be supported by probable cause, "an officer may conduct a brief investigatory detention"—also referred to as a "*Terry* stop"—"as long as the officer has *reasonable suspicion* that the person to be detained is committing or has committed a criminal offense." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (emphasis added) (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Even a properly initiated investigatory stop, however, may "ripen into a *de facto* arrest that must be based on probable cause." *Compton*, 830 F.3d at 64. When a court considers a claim of de facto arrest, the following facts are "generally deemed relevant":

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004). As we cautioned in *Newton*, "No one of these factors is determinative. But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." *Id.* (citation and internal quotation marks omitted).

The Supreme Court has emphasized that "[i]t is the [Government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion

10

was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983). We apply "an objective standard" in assessing the Government's asserted justification, asking whether "the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate[.]" *Terry*, 392 U.S. at 21–22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

B.     The investigatory stop in this case

On appeal, the parties appear to agree to two propositions: first, that Officer Gruppuso had reasonable suspicion sufficient to justify initiating a *Terry* stop, and second, that he did not have probable cause to arrest Fiseku until he discovered the suspicious equipment inside the Pathfinder. Fiseku urges us to conclude that the investigatory stop ripened into a de facto arrest unsupported by probable cause when, shortly after initiating the *Terry* stop and patting him down, Gruppuso handcuffed him. On de novo review, we conclude that this case presents "unusual circumstances" under which an officer may handcuff a suspect without "transform[ing] a *Terry* stop into an arrest." *Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017).

When, at approximately 1:25 a.m., Gruppuso followed the white Pathfinder into the dark parking lot surrounded by trees, he had reason to believe that Jajaga had lied about why he was in rural Bedford so late at night. It was highly improbable that Jajaga had managed to get the vehicle started mere moments after telling Gruppuso that he was stranded with a broken transmission and was waiting for a friend to arrive from distant Brooklyn with a tow truck. Gruppuso's suspicions were reasonably heightened when he saw that the Pathfinder now had a passenger (Hughes), and that a third man (Fiseku)—also not earlier present—was walking around the side of the vehicle. During the conversation on the dirt pull-off, Gruppuso had believed that Jajaga was the

11

vehicle's only occupant. Given those observations, and given that Gruppuso arrived in the parking lot mere moments after the Pathfinder, Gruppuso might reasonably have inferred either that the additional two men had been hiding in the vehicle during the conversation on the pull-off, or that they had been waiting in the parking lot for Jajaga to arrive. In either event, and in this setting, a reasonably cautious officer in Gruppuso's position would have objective grounds to suspect that the three men were about to commit a crime, or that they had recently done so. Moreover, the officer would recognize how little he knew in this quickly evolving situation, where both the degree of suspicion and the number of suspects had grown substantially in the space of ten minutes.

Gruppuso radioed for assistance, but given the late hour and the remote location, he could not be sure how many units would respond, or how long it would take them to arrive. In fact, two units responded within minutes, but by that time, Gruppuso had already begun interacting with Fiseku. A pat-down did not reveal any weapons or contraband on Fiseku's person, but the Supreme Court has "expressly recognized" that "suspects may injure police officers and others by virtue of their *access* to weapons, even though they may not themselves be armed." *Michigan v. Long*, 463 U.S. 1032, 1048 (1983) (emphasis added). The *Long* Court explained further that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id*. at 1047. When Jajaga and Fiseku were restrained in handcuffs, an additional suspect (Hughes) remained seated in the Pathfinder, where weapons may have lain within reach. Moreover, in the dark, tree-lined parking lot, Gruppuso could not feasibly conduct a protective perimeter sweep to check for secreted weapons or additional associates while monitoring three suspects, whom the District Court described as "muscular men." App'x 185.

12

We generally view handcuff use as a "hallmark of a formal arrest." *Newton*, 369 F.3d at 676. At the same time, we have long recognized that, "regardless of whether probable cause to arrest exists," a "law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990). Recognizing the tension between these competing principles, we have explained that the Fourth Amendment occasionally will permit handcuff usage during a *Terry* stop when the "police have a reasonable basis to think that the person detained poses a present physical threat *and* that handcuffing is the least intrusive means to protect against that threat."[6] *Bailey*, 743 F.3d at 340 (emphasis added). To that end, we have previously found that officers acted reasonably in using handcuffs when they acted based on reliable information that a suspect was armed and possibly dangerous. *See, e.g.*, *Grice*, 873 F.3d at 168 (The officer "received a report . . . of an individual matching [the suspect's] description bending down by the [train] tracks with a remote control device," and so "had reason to believe" that the suspect "might use an electronic device to set off an explosive on the tracks."); *Newton*, 369 F.3d at 675 (Officers visited an apartment "to investigate a report that [the suspect] illegally possessed a firearm and had recently threatened to kill his mother and her husband."); *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) ("[T]he officers had

---

[6] Officer Gruppuso testified at the suppression hearing that it is not "unusual" for him to use handcuffs during investigatory stops. App'x 138. In determining whether police conduct is consistent with the Fourth Amendment, we assess the circumstances objectively, and not according to the subjective motivations of police officers, *see Whren v. United States*, 517 U.S. 806, 813 (1996), let alone what an officer's practice might be in other circumstances. Accordingly, the only question before us is whether Gruppuso acted reasonably under the circumstances of Fiseku's apprehension. We have emphasized that "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest." *Grice*, 873 F.3d at 167. Several of our sister circuits have similarly cautioned that the use of handcuffs in *Terry* stops is not "a matter of routine." *United States v. Acosta-Colon*, 157 F.3d 9, 18 (1st Cir. 1998); *see also Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013).

reliable information that [the suspect] was carrying a weapon," and he "demonstrated his unwillingness to cooperate . . . by fleeing . . . when originally approached and continuing to struggle . . . following the stop.").

In this case, Fiseku asserts that Gruppuso acted unreasonably and based on suspicion alone: Gruppuso had neither received reports of, nor directly observed, conduct suggesting that the occupants of the Pathfinder had engaged in criminal activity, or that any of them carried a weapon or otherwise presented a physical threat or risk of flight. In Fiseku's view, his apprehension closely resembles the investigatory stop in *United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014), in which this Court found the use of handcuffs to be unreasonable. We find this comparison inapt.

In *Bailey*, two detectives were surveilling an apartment in which, according to a reliable informant, a man armed with a handgun was selling drugs. Two men, each of whom matched the drug dealer's general description, emerged from the apartment and got into a car. The detectives followed the car for approximately one mile, then directed the men to pull over in a fire station parking lot and exit the vehicle. A pat-down revealed no weapons. In response to the detectives' questions, one of the men claimed to live at the surveilled apartment. The detectives handcuffed the men and detained them while the police searched the apartment pursuant to a warrant that had been issued earlier that same day. On appeal, we found a Fourth Amendment violation in the handcuffing, concluding that the record evinced no "physical threat" or other factor that would justify handcuffing the two men. *Id*. at 340. We cautioned, however, that in a future case, "the government may be able to point to circumstances supporting a reasonable basis to think that even an unarmed person poses a present physical threat or flight risk warranting handcuffing." *Id*.

We find persuasive the District Court's thorough discussion here of material differences between the circumstances of Fiseku's apprehension and the stop in *Bailey*. *See Suppression Order*, 2015 WL 7871038, at \*9–10. In *Bailey*, the detectives selected when and where to conduct the investigatory stop, and apprehended the two men with the legitimate, limited purpose of confirming whether either of the car's occupants might be a resident of the apartment under surveillance. The detectives might have suspected that one or both men had committed a crime at some point in the past, but the record did not suggest any *ongoing or imminent* criminal activity. Here, by contrast, Gruppuso stumbled upon a suspicious scenario in the middle of the night in a remote, wooded location where three suspects had, it appeared, arranged to meet. His goal was not simply to identify the men, but to confirm or rebut his suspicion that they had committed, or were poised to commit, a home invasion or some other crime. The likelihood of ongoing or imminent criminal activity heightened the risk that one or more suspects might be armed and that they might attempt to fight or flee. Gruppuso made quick decisions about how best to protect both himself and the public, acting in the face of uncertainty about how many associates might be present, what sort of criminal activity they might be involved in, or whether any of them might have access to a weapon.[7]

Gruppuso made the cautious choice to restrain Jajaga and Fiseku in handcuffs at the outset of the investigatory stop so he could safely turn his attention to the suspect

---

[7] We have previously cautioned that "suspecting a person of having committed a burglary cannot, in and of itself, provide police with grounds to subject that person to an extremely intrusive *Terry* stop." *Oliveira v. Mayer*, 23 F.3d 642, 647 n.1 (2d Cir. 1994). Here, however, our review of "the facts available to [Gruppuso] at the moment of the seizure or the search," *Terry*, 392 U.S. at 21–22, confirms that he acted on the basis of more than mere suspicion of wrongdoing.

remaining in the vehicle and the two newly arrived police cruisers. Under these circumstances, "handcuffing was a less intimidating—and less dangerous—means of ensuring [officer] safety . . . than holding [Jajaga and Fiseku] at gunpoint." *Newton*, 369 F.3d at 675. Given the "swiftly developing situation" in which Gruppuso found himself, we heed the Supreme Court's warning not to "indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). As the *Sharpe* Court explained, "The question is not simply whether some other alternative was available, but whether the police acted *unreasonably* in failing to recognize or to pursue it." *Id.* at 687 (emphasis added). Here, although Gruppuso might have chosen to proceed without using physical restraints, we conclude that he did not act *unreasonably* when he placed Fiseku in handcuffs shortly after initiating the investigatory stop.

Having concluded that the initial application of handcuffs was reasonable, we next consider whether the continued use of handcuffs became unreasonable at some point thereafter. We conclude that it did not. In the space of ten minutes, the three officers patted down and handcuffed the three suspects, separated them, questioned each of them at least once, then searched the Pathfinder and discovered highly suspicious equipment inside, at which point (as Fiseku concedes) they had probable cause to effectuate an arrest. As the District Court explained, the record does not suggest "that the officers were at all dilatory in questioning the three men." *Suppression Order*, 2015 WL 7871038, at *11; *see also, e.g., Grice*, 873 F.3d at 168 ("[T]hirty-three minutes was not an unreasonable interval to keep the handcuffs on while officers and a dog searched the tracks for a potential bomb."). Further, if handcuffs were reasonable when three officers were questioning three suspects in this remote area late at night, then handcuffs remained reasonable when one or more of those officers turned his attention away from the suspects in order to briefly search a vehicle. *See, e.g., United States v. Hurst*, 228 F.3d 751, 758 n.3 (6th Cir. 2000) ("[W]here defendant was reasonably

16

suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety during the vehicle search was not unreasonable or otherwise improper.").

For the reasons set forth above, we conclude that Officer Gruppuso and his colleagues did not violate Fiseku's Fourth Amendment rights by restraining him in handcuffs during the initial ten minutes of the investigatory detention before probable cause was established. We accordingly affirm the District Court's decision not to suppress the physical evidence recovered during the officers' search of the Pathfinder.

## II.    Fiseku's claim of ineffective assistance of counsel

Fiseku's second argument on appeal is that he received ineffective assistance of counsel in connection with his sentencing. He contends in particular that defense counsel should have challenged his classification as a "career offender" under section 4B1.1 of the Sentencing Guidelines on the grounds that his crime of conviction (conspiracy to commit Hobbs Act robbery) does not meet the definition of a "crime of violence" set forth in Guidelines section 4B1.2.

We are "generally reluctant to address ineffectiveness claims on direct review," a stage at which "the constitutional sufficiency of counsel's performance is usually unripe for seasoned retrospection." *United States v. Rivernider*, 828 F.3d 91, 106 (2d Cir. 2016) (internal quotation marks omitted). That reluctance is particularly appropriate in this instance. We note, first, that the legal issue underlying Fiseku's ineffective assistance claim presents an interpretive question about the Guidelines that this Circuit has yet to

address.[8] Moreover, the record on appeal is silent as to defense counsel's conversations with Fiseku and strategic calculations regarding Fiseku's plea agreement (in which the parties stipulated to Fiseku's status as a career offender) and sentencing submissions (in connection with which defense counsel did, in fact, argue against a "career offender" designation, albeit on different grounds than those Fiseku describes in his ineffectiveness claim). Given these legal and factual uncertainties, "we decline to review defendant's claim of ineffective assistance of counsel on the record now before us." *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Our decision here does not foreclose Fiseku from asserting an identical claim of ineffective assistance of counsel in a future motion under 28 U.S.C. § 2255, should he so desire.

**CONCLUSION**

Given the unusual circumstances of this case, we are unable to conclude that the officers acted unreasonably in restraining Fiseku and his associates in handcuffs as they did. Accordingly, we **AFFIRM** the judgment of the District Court.

---

[8] In a recent decision, we determined that conspiracy to commit Hobbs Act robbery meets the definition of a "crime of violence" in the Armed Career Criminal Act, 18 U.S.C. § 924(c)(3)(A). *United States v. Barrett*, — F.3d —, No. 14-2641-CR, 2018 WL 4288566, at *1 (2d Cir. Sept. 10, 2018). That provision is worded identically to the "force clause" provision in section 4B1.2(a)(1) of the Guidelines, and so *Barrett* offers persuasive authority that Fiseku's crime of conviction similarly meets the Guidelines definition of a "crime of violence." *United States v. Walker*, 595 F.3d 441, 443 n.1 (2d Cir. 2010). We have not officially so held, however, and we need not do so in this appeal.