15-4124-cv
Grice v. McVeigh, et al.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: April 4, 2017    Decided: September 29, 2017)

Docket No. 15-4124-cv

- - - - - - - - - - - - - - - - - -x

GREGORY A. GRICE, III,

Plaintiff-Cross Defendant-Appellee,

- v.-

ANTHONY MCVEIGH, FRANK FARINA, Individually,

Defendants-Appellants,

DEREK HOSEIN, Individually, MICHAEL ALFALLA, Individually, KENNETH STEWART, Individually, DONALD HEAGLE, Individually, KEVIN MADDINE, Individually, JONATHAN PISCATELLI, Individually, MICHAEL SACHAR, Individually, MARK DELIA, Individually, HERMAN KILLEBREW, Individually, ROBERT BARNETT, Individually, THOMAS MCCORMACK, Individually, JOSEPH HORESKY, Individually, KATHLEEN CRISTIANO, Individually, BRIAN SCOTT, Individually, and JAMES LUCIANO, Individually,

Defendants,

TOWN OF NORTH CASTLE, NEW YORK,

                    <u>Defendant-Cross Claimant-Cross Defendant</u>,

WESTCHESTER COUNTY, JOHN HOSEIN, JOHN AND JANE DOE 1-15, and TOWN OF GREENBURGH, NEW YORK,

                    <u>Defendants-Cross Defendants</u>,

METROPOLITAN TRANSIT AUTHORITY,

                    <u>Defendant-Cross Defendant-Cross Claimant</u>.
- - - - - - - - - - - - - - - - - - -x


          Before:              WALKER, JACOBS, and PARKER, <u>Circuit Judges</u>.

          Plaintiff-Appellee Gregory A. Grice, III, a teenaged train enthusiast, was stopped and handcuffed after police received a report that someone holding an electronic device was bending down by the tracks at a rail crossing.  The United States District Court for the Southern District of New York (Román, <u>J</u>.), denied a motion by the police seeking qualified immunity.  We reverse.

          Judge Parker dissents in a separate opinion.

                              THOMAS J. TROETTI, White Plains, New York, <u>for Appellants Anthony McVeigh and Frank Farina</u>.

                              BRETT H. KLEIN, (Lissa Green-Stark, <u>on the brief</u>) New York, New York <u>for Appellee Gregory A. Grice, III</u>.


DENNIS JACOBS, <u>Circuit Judge</u>:

          Plaintiff-Appellee Gregory A. Grice, III, a 16 year old train enthusiast, was

2

stopped and handcuffed after the Greenburgh Police Department received a 911 report that someone holding an electronic device was bending down by the tracks at a rail crossing. After a search of the tracks by the Metropolitan Transit Authority ("MTA"), the Greenburgh officers turned Grice over to the MTA officers, who detained him and charged him with trespass.

When the trespass charge was dismissed, Grice sued all concerned. The only remaining defendants are Sergeant Anthony McVeigh and Lieutenant Frank Farina of the Greenburgh police. Grice alleges false arrest, failure to intervene, and failure to supervise. The United States District Court for the Southern District of New York (Román, J.) denied their motion for qualified immunity. On this interlocutory appeal, we reverse. It cannot be said that every reasonable officer in their circumstances would know that the conduct complained of violated clearly established law.

**I**

The facts are undisputed for the purpose of this appeal. Grice's cellphone (set to record the trains) taped audio of his encounter with the police, and the two officers have (necessarily) agreed to accept Grice's version of the facts. "Once a defendant asserting qualified immunity has agreed to be bound by the plaintiff's version of the facts, the issues become purely legal and we have jurisdiction over an interlocutory appeal from a denial of immunity." Loria v. Gorman, 306 F.3d 1271, 1280 (2d Cir. 2002). Defendants may try to "evade their agreement by spinning the facts in their favor"; but we simply ignore any factual contentions that contradict the plaintiff's version of the facts. Id.

In the evening on June 6, 2011, Grice was lawfully watching trains at the Virginia Road railroad crossing in Greenburgh, New York. He was seen by a passing driver, Mary Andrachik, who told a 911 dispatcher that someone with a red shirt "was actually on the train tracks" and was holding "a little controller." Joint App'x at 521-22. She said his behavior seemed "suspicious" and "bizarre." Id. at 521. The dispatcher directed police units to investigate "a male white, wearing a red shirt bending down by the tracks with a remote control object in his hands" at "Virginia Road, by the train tracks crossing." Id. at 524.

3

Sergeant Anthony McVeigh of the Greenburgh police arrived at the scene first, alone. A police officer since 1995, he was commander for some years of Greenburgh's Special Operations Unit, which includes the SWAT team. Over the course of a year, he had received several briefings and bulletins about the possibility that terrorists would attempt to sabotage railroad tracks; about a month before the encounter with Grice, McVeigh received a circular on attempted rail sabotage in a nearby town.

When McVeigh arrived at the crossing, Grice was wearing a red shirt, was holding a camera, and was standing approximately 12-15 feet from the tracks, next to a barricade. A backpack was on the ground, and two electronic devices-–one with an antenna--were next to him on top of the barricade. One device was a cell phone; the other, a radio scanner. The only deviation from the radioed description of Grice was his race: the dispatcher said he was white, while Grice is African-American.

McVeigh asked Grice what he was doing, and seemed puzzled when Grice said he was taking pictures of the trains and listening to Metro North broadcasts. Grice told McVeigh that he had a letter from the MTA explaining that what he was doing was "okay." Id. at 558. Grice then suggested that he or McVeigh could retrieve that letter from his backpack. But McVeigh was concerned that there might be a sabotage device that could be activated remotely; so he told Grice a few minutes into their conversation, "Right now I'm going to cuff you for my safety and your safety . . . Until I find out what's going on here." Id. at 559.

Lieutenant Frank Farina and several other Greenburgh police officers arrived shortly after. Grice explained to them that he was a "rail fan" who had watched the trains at Virginia Road several times. McVeigh responded:

> We don't know what you're doing out here. It's very unusual to do what you're doing. We don't get complaints like this . . . You're the first guy in my career that's ever been sitting next to a train with a radio looking at trains and taking pictures[.]

Id. at 566-67.

4

MTA officers arrived approximately 15 minutes after McVeigh cuffed Grice. They began questioning Grice anew, and the tracks were searched for a bomb by officers and a dog. When the search turned up nothing, McVeigh asked the MTA officers if he could switch out his handcuffs with the MTA's, and an MTA officer agreed. Grice was in McVeigh's handcuffs for about 33 minutes.[1] When the involvement of McVeigh and Farina ended at this point, MTA officers took Grice to an MTA facility, placed him in a cell, interrogated him, and gave him a summons for trespass. The trespass charge was ultimately dropped.

Grice sued several police officers and government entities, including the MTA, seeking damages for his handcuffing, arrest, and prosecution. He settled his claims against most of the defendants for a total of $24,000. Remaining are claims for false arrest, failure to intercede, and supervisory liability against (variously) McVeigh and Farina. The district court denied the officers' motion for summary judgment, and they appeal, arguing that they are entitled to qualified immunity.

## II

"Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks omitted). Rights must be clearly established in a "particularized" sense, rather than at a high level of generality; and such rights are only clearly established if a court can "identify a case where an officer acting under similar circumstances" was held to have acted unconstitutionally. White v. Pauly, 137 S.

---

[1] The dissent argues that McVeigh advanced contradictory explanations for the handcuffs. First, he told Grice he was being handcuffed for safety, and then, after no bomb was found, kept him cuffed for trespassing. But McVeigh and Farina both made clear from the onset of their interaction with Grice that they believed that Grice had been on the MTA railroad tracks. So the two explanations do not contradict: if a bomb had been found, the trespass would not have been worth mentioning.

Ct. 548, 552 (2017). The qualified immunity standard is "forgiving" and "protects all but the plainly incompetent or those who knowingly violate the law." Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (internal citations omitted).

## A.     The Unlawful Arrest Claim Against McVeigh

Grice's unlawful arrest claim fails because his handcuffing was an "investigatory detention" (otherwise known as a "Terry stop") that never ripened into an arrest and was supported by reasonable suspicion. Police stops fall into two categories: arrests and Terry stops. Arrests require probable cause, while a police officer may make a Terry stop "as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense." United States v. Compton, 830 F.3d 55, 61 (2d Cir. 2016). The standard for reasonable suspicion is "not high," and is less than what probable cause requires. United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (internal citation omitted). Whether an officer's suspicion is "reasonable" is an objective inquiry based on the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training. United States v. Singletary, 798 F.3d 55, 60 (2d Cir. 2015).

McVeigh had reasonable suspicion to stop Grice, either for unlawful interference with a train or for trespass. N.Y. R.R. Law § 53-e; N.Y. Penal Law § 140.05. McVeigh had been ordered to look out for sabotage on the railroad. Less than a month earlier, he had received a training circular advising that someone had attempted to sabotage a railroad in nearby Patterson, New York, using "a homemade device, wrapped in black tape with a radio-control antenna affixed." Joint App'x at 101. The dispatcher called in a tip from an observer that someone was "bending down by the tracks with a remote control object in his hands," id. at 524, and McVeigh saw someone matching the observer's description with various electronic devices, some more familiar than others.

McVeigh was unaware of any plausible innocent reason that could explain why someone would be taking photos of trains and listening to the railroad's radio broadcasts. Grice told McVeigh he was a train buff and that he had received permission from the MTA to take photographs as long as he was not on MTA property, but McVeigh had never heard of trainspotting until the encounter

6

at the railroad crossing.  He was not required to credit an innocent explanation that seemed implausible given his knowledge at the time.  "Suspicious circumstances may have innocent explanations; but the availability of an innocent explanation does not create an issue of fact as to the reasonableness of the suspicion."  Holeman v. City of New London, 425 F.3d 184, 191 (2d Cir. 2005).  McVeigh's suspicion that Grice may have committed a crime was reasonable, and he was entitled to stop him to investigate.

A Terry stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place.  Compton, 830 F.3d at 64; United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993).  In general, to determine whether a Terry stop is so intrusive as to become an arrest, we look to:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

Id. at 645 (internal punctuation and citations omitted).

Handcuffing is ordinarily not incident to a Terry stop, and tends to show that a stop has ripened into an arrest.  But a police officer, "faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."  United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990).  In certain unusual circumstances, we have therefore held that handcuffing a suspect to investigate a reasonable suspicion does not transform a Terry stop into an arrest.  See, e.g., United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (handcuffing a potentially armed suspect to search him for a firearm was not an arrest); United States v. Vargas, 369 F.3d 98, 102 (2d Cir. 2004) ("[A]lthough under ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the

7

part of the investigating officers." (internal punctuation omitted)).  We ask if "police have a reasonable basis to think that the person detained poses a present physical threat and handcuffing is the least intrusive means to protect against that threat."  Bailey, 743 F.3d at 340.

These circumstances can easily be classified as unusual.  McVeigh was on the lookout for railroad sabotage, received a report by police radio of an individual matching Grice's description bending down by the tracks with a remote control device, and was unaware of a pastime that could explain the behavior that was observed.  He therefore had reason to believe, suspect, and fear that Grice might use an electronic device to set off an explosive on the tracks.  It was not unreasonable for a lone officer to handcuff Grice in order to ensure that Grice could not press a detonator button on any electronic device until the tracks could be searched.

McVeigh's intent to handcuff Grice for protection rather than pursuant to arrest is clear: he never administered a Miranda warning, and he explained to Grice that he was handcuffing him "for my safety and your safety . . . [u]ntil I find out what's going on." Joint App'x at 559.  McVeigh released Grice from his handcuffs after the MTA finished its investigation of the tracks; and thirty-three minutes was not an unreasonable interval to keep the handcuffs on while officers and a dog searched the tracks for a potential bomb.  United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) ("We decline to hold that a thirty minute detention based on reasonable suspicion is, per se, too long."); see also United States v. Vega, 72 F.3d 507, 516 (7th Cir. 1995) (concluding that a Terry stop lasting 62 minutes was not a de facto arrest because "part of that 62 minutes consisted of waiting for the narcotics sniffing dog to arrive."); United States v. Sharpe, 470 U.S. 675, 687 n.5 (1985) (finding it reasonable for state patrolman to detain plaintiff pending federal agent's arrival because "as a highway patrolman, he lacked [the agent's] training and experience in dealing with narcotics investigations.").  Because McVeigh had an objectively reasonable suspicion to detain Grice, and because McVeigh's detention of Grice did not ripen into an arrest, McVeigh is entitled to qualified immunity on the false arrest claim.

According to the dissent, it was obvious to the police that Grice was

engaged in an innocent pastime: Grice's explanation that he was "just taking pictures" was "a fact easily corroborated by the fact that Grice had a camera rather than a 'remote control' device . . . or a bomb." Dissent at 2. But Grice also had an electronic device with an antenna sitting on the barricade (which turned out to be a police scanner) as well as a cell phone. True, the use of a cell phone as a remote control detonator is not a feature promoted by manufacturers; at the same time, remote detonation of a bomb or improvised explosive device by cell phone is a standard technique for terrorists, as demonstrated in the margin.[2]

## B.      The Failure to Intercede Claim Against McVeigh and Farina

Grice argues that the defendants are liable for their failure to intervene with the MTA police officers to prevent Grice's continued handcuffing. McVeigh and Farina, as officers of the Town of Greenburgh, had no evident authority over officers of the MTA, who serve in a separate hierarchy in a separate jurisdiction with particular responsibility for security of the railroad. In any event, MTA officers did not seem to be mistreating Grice, and could reasonably decide to interview Grice at the MTA facility. If McVeigh and Farina had a duty to intervene in those circumstances, that duty was not clearly established, and the defendants therefore enjoy qualified immunity on that claim. See Pauly, 137 S. Ct. 552 (holding that law is clearly established only when a court can "identify a

---

[2] A cell phone has been used as a detonator in virtually every recent attempted or actual bombing in the U.S. In New York, Ahmad Rahimi detonated multiple bombs in Manhattan and on the Jersey Shore using cell phones. See Compl. at 4, U.S. v. Rahimi, No. 16-cr-760 (S.D.N.Y. Sep. 20, 2016), ECF No. 1; see also Compl. at 20, U.S. v. Nafis, No. 12-cr-720 (E.D.N.Y. Oct. 17, 2012), ECF No. 1 (convicted terrorist attempted to bomb the Federal Reserve Bank in Manhattan using a cell phone as the detonator). Other relatively recent examples include the Boston Marathon Bombing and attempts in Washington, D.C., Dallas, Florida, and outside Chicago. About a month ago, the FBI arrested a man in Oklahoma City who attempted to blow up a vehicle containing a 1,000-pound ammonium nitrate bomb using a cell phone as the detonating device. See Compl. at 17, U.S. v. Varnell, No. 17-mj-368 (W.D. Okla. Aug. 13, 2017), ECF No. 1.

case where an officer acting under similar circumstances" was held to have acted unconstitutionally).

## C.     The Supervisory Liability Claim Against Farina

Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor *and* the subordinate both violate clearly established law. Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002). Since, as we have already ruled, McVeigh did not violate clearly established law, Farina is entitled to qualified immunity as well.

## CONCLUSION

For the foregoing reasons, the order of the district court is reversed.

BARRINGTON D. PARKER, Circuit Judge, dissenting:

The majority, by granting qualified immunity to Sergeant Anthony McVeigh and Officer Frank Farina of the Greenburgh, New York police department, absolves them of the arrest of Gregory Grice. Grice was an indisputably innocent 16-year old young man who was arrested while standing at a location where he had every right to be and doing what he had every right to do. The majority mischaracterizes Grice's detention as a *Terry* stop. It was no such thing: it was an arrest and the facts that we are obligated to accept for purposes of this appeal establish that there was no probable cause for the arrest. Because McVeigh and Farina are not entitled to qualified immunity, I respectfully dissent.

## I

Those facts establish the following. Grice is a train buff just like many others. As an aspiring engineer, he has an extensive knowledge of trains, attends public hearings of New York's Metropolitan Transportation Authority ("MTA"), volunteers on Saturdays at a railway museum in Danbury, CT, and enjoys taking photographs of passing MTA trains. This hobby led to his arrest.

On June 6, 2011, Grice left school and headed for a section of MTA train tracks, arriving around 4:30 p.m. at a train crossing in Greenburgh. He was familiar with the MTA's rules and, as was his habit, diligently followed them on that day. He had done this precise activity many times before. He had with him an MTA rule book as well as a letter from the MTA permitting him to take the photographs that led to his arrest. MTA personnel were quite familiar with him and were well aware of his penchant for photographing trains.

However, a passing motorist saw Grice, and, at 5:54 p.m., called the Greenburgh Police Department ("GPD") to report a "suspicious" "mix race" male near the tracks. Joint App'x ("JA") 521–24. At 5:57 p.m., the GPD dispatcher radioed out an (incorrect) description of the individual

seen by the motorist: "a male white, wearing a red shirt bending down by the tracks with a remote control object in his hands." JA 524. McVeigh heard that dispatch and, minutes later, at 6:03 p.m., arrived at Grice's location. What he witnessed differed from the dispatcher's report. Grice is black, not white, had no "remote control," and was not trespassing but was well back from the tracks.

McVeigh, in order to determine what was occurring, engaged Grice, who immediately informed McVeigh that he was "just taking pictures," a fact easily corroborated by the fact that Grice had a camera rather than a "remote control" device the dispatch reported or a bomb. JA 555. Grice's statements to McVeigh further corroborated the innocent nature of Grice's presence near the tracks: "I'm a rail fan like everybody else," and "I always keep myself at a safe distance." JA 558. Moreover, contrary to the majority's view, Op. at 10, McVeigh need not have taken Grice at his word; Grice offered McVeigh evidence establishing that his acts were innocent. Grice promptly told McVeigh: "I have a letter I e-mailed the MTA and they said [what I am doing] is okay. I can show you the letter. It's in my bag." JA 558. Grice even told McVeigh he could "take [the letter] out of my bag." JA 558. For whatever reason, McVeigh chose not to retrieve or review the e-mail, even though officers who had stopped Grice in the past had any suspicions they may have had alleviated by reviewing that letter. JA 565, 578–79.

About two minutes later, without any meaningful inquiry and having seen nothing illegal or suspicious,[1] McVeigh handcuffed Grice, ostensibly for "my safety and your safety." JA 559. It is

---

[1] The majority summarily states that "McVeigh was unaware of any plausible innocent reason that could explain why someone would be taking photos of trains and listening to the railroad's radio broadcasts." Op. at 9. It is unclear to me how the majority can make this statement when we are to assume the truth of Grice's story, which is that there are "thousands" of rail fans just like him. JA 566; *see also* JA 558 (Grice telling McVeigh that he is "a rail fan *like everybody else*"). The necessary inference from that record evidence is that taking photos of trains is fairly common and that therefore McVeigh did in fact have reason to understand what Grice was doing. Moreover, any pre-handcuffing lack of awareness of the innocence of Grice's behavior is of McVeigh's own making. He for some reason chose not to review the MTA's letter giving Grice express permission to do what he was doing. Had McVeigh reviewed that letter—which, in my view, any reasonable officer would have done—he would have been quite aware of a "plausible innocent reason" that Grice was by the tracks.

2

clear that handcuffing in these circumstances constituted an arrest. The law of our Circuit is that "handcuffs are generally recognized as a hallmark of a formal arrest." *U.S. v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014). McVeigh then required that Grice sit on the ground and proceeded to question him extensively and aggressively.[2] It is not possible rationally to conclude that these circumstances constituted anything other than an arrest. After all, Grice was under the most complete measure and method of restraint that McVeigh had available to him and no one could believe that Grice was free to leave. No opinion of our Court has ever held that handcuffing for the period of time experienced by Grice and behaving in the way he behaved was not an arrest.

Other GPD officers shortly came on scene, including Officer Frank Farina. They were followed by officers of the MTA, who arrived shortly thereafter and immediately recognized Grice as the hobbyist with whom they were familiar. *See* JA 597 (MTA Officer Hosein, for example, stated that he had "seen [Grice] around a million times before"). Nevertheless, the MTA officers investigated the scene and determined that Grice posed no threat. JA 334–35. McVeigh and Farina acknowledge that while Grice was detained, it became clear to them that Grice posed no threat of violence or train interference. JA 470, 477, 502.

Although McVeigh initially told Grice he was being detained for his protection, after it became clear that Grice posed no threat, McVeigh and Farina changed their story. McVeigh subsequently justified the detention exclusively on the basis that he suspected that Grice had

_____

[2] McVeigh contends that his treatment of Grice was warranted because he believed Grice might have been a terrorist. McVeigh contends that "[s]ince 9/11 terrorism is a big concern in mass transit." JA 215. McVeigh and Farina introduced six documents (totaling 11 pages) received by the GPD supporting the existence of terrorist threats. Three describe highly general nation-wide threats posed by al-Qaida. JA 96–100. Another is a brief description of an incident that occurred at a railroad crossing nearly 50-miles away in which a "homemade device" was found on the tracks that had no "impact to rail operations" other than causing an electrical circuit to break. JA 101. The report does not indicate what the device was or whether it was put on the tracks intentionally. Nothing in the record connects the device to any terrorist activity. Finally, the last two are MTA police department alerts which are irrelevant because they are dated well *after* the incident with Grice. JA 102–04.

3

trespassed on the tracks, JA 470, and Farina joined McVeigh's new version. Farina responded to Grice's inquiry about what he did wrong not by mentioning anything of safety, but by saying, "[y]ou're trespassing." JA 5. However, McVeigh and Farina had no first-hand basis to conclude that Grice trespassed. McVeigh and Farina's suspicion of trespass was based only on the unverified and unsworn report of an absent 911 caller (which was clearly insufficient to establish probable cause for trespass).

The majority ignores this changing rationale for Grice's detention. Specifically, the majority asserts that "McVeigh released Grice from his handcuffs as soon as the MTA finished its investigation of the tracks." Op. at 12; *see also* Op. at 6 (McVeigh released Grice "[w]hen the search [for a bomb] turned up nothing"). However, McVeigh's testimony and Farina's statement to Grice belie that assertion. *See* JA 470, 573.

In contrast to the majority's view, it was not until well after McVeigh and Farina were aware that Grice posed no threat to the tracks that McVeigh removed his handcuffs from Grice. Yet, rather than release Grice, McVeigh handed over custody of Grice to MTA officers based on McVeigh's newly minted trespass theory. To justify doing this, McVeigh told the MTA that when he arrived he personally saw Grice standing on the tracks. JA 471. This version sharply contrasts with that of Grice who asserts that he was never on the tracks and never closer than 12 to 15 feet from them. Accepting those facts as true and drawing every inference in Grice's favor, as we must, requires us to assume for qualified immunity purposes that McVeigh's statement to the MTA police about Grice's location on the tracks was not true. McVeigh's fabrication is significant because the record makes clear that the sole basis for the MTA's decision to keep Grice in custody and charge him with

4

suspicion of trespass was McVeigh's report. *See* JA 520. Unsurprisingly, the trespass charge was later dropped, given there was no credible evidence to conclude Grice ever trespassed.

Having been cleared of all wrongdoing, Grice sued all involved. Most defendants settled. McVeigh and Farina did not. After extensive discovery, and despite McVeigh and Farina's objections that they were protected by qualified immunity, the district court denied summary judgment on the ground that there were factual disputes requiring a trial. The majority reverses that decision. I would not.

## II

I begin by noting that today's decision oversteps our jurisdiction. No final decision was entered below, a fact which would ordinarily preclude our review. *See* 28 U.S.C. § 1291. However, under certain conditions we may review the denial of a summary judgment motion when that motion was based on a claim of qualified immunity. *See Plumhoff v. Rickard*, 134 S.Ct. 2012, 2019 (2014). In determining whether we may assert jurisdiction in such a case, the "critical issue is whether the interlocutory appeal raises purely legal questions." *Loria v. Gorman*, 305 F.3d 1271, 1280 (2d Cir. 2002). And, generally, "an order denying summary judgment based on a determination of 'evidence sufficiency' does not present a legal question." *Plumhoff*, 134 S.Ct. at 2019 (citing *Johnson v. Jones*, 515 U.S. 304, 314 (1995)).

McVeigh and Farina invoke a narrow exception to this rule in which "a defendant asserting qualified immunity has agreed to be bound by the plaintiff's version of the facts [and] the issues [therefore] become purely legal." *Loria*, 306 F.3d at 1280. It is well settled that this avenue is available only where appellants are "willing to accept plaintiff's version of the facts for purposes of the appeal." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *see also Loria*, 306 F.3d

5

at 1280.  In addition, we must "disregard so much of [defendant's] version as is contrary to plaintiff's version." *O'Bert v. Vargo*, 331 F.3d 29, 39 (2d Cir. 2003).  Neither McVeigh or Farina nor the majority accept Grice's version.[3]

Once we assume for purposes of this appeal Grice's version of the facts, we are dealing with a record that establishes the following. (i) Grice was at all times where he had every right to be and was doing what he had every right to do;  (ii) Grice had evidence, previously accepted by the police, which established his innocence and that evidence was made available to McVeigh at the outset of the encounter; (iii) Grice never engaged in any threatening, unsafe, or suspicious behavior, and was at all times calm and cooperative; (iv) Grice never trespassed, nor did McVeigh or Farina have any first-hand basis to conclude that he did; (iv) yet, once it became clear that Grice posed no terrorist threat, McVeigh told the MTA police that he saw Grice trespassing.  The majority in large part ignores these elements of Grice's story, and turns instead to the contradictory version presented on appeal by McVeigh and Farina.   The majority, without discussion, condones this bait-and-switch. I would not.

---

[3]  The fact that we do not accept appellants' representation as to what facts they agree to is especially important here. Although McVeigh and Farina purport to accept Grice's facts in order to get before this court, they in fact do not do so. In their reply brief, McVeigh and Farina concede that Grice "was detained for 45–50 minutes, in handcuffs, even though he was no closer than 12–15 feet from the train tracks."  Reply Br. of Appellants at 1–2.  Despite this purported concession, appellants presented  numerous other disputed facts.  For example, the briefs differ on whether Grice had a scanner in-hand on McVeigh's arrival on scene. *Compare* Br. of Appellants at 9 n.4 *with* Br. of Appellee at 7. McVeigh and Farina's counsel also offered disputed highly relevant facts at oral argument.  Specifically, he adamantly argued that the decision by the MTA to charge Grice with trespass was motivated by the motorist's report, rather than information from McVeigh. *See* Oral Arg. Recording at 32:15.  This assertion directly contradicts Grice's version of the facts, namely, that the MTA "issued the summons based on information provided . . . by McVeigh."  Br. of Appellee at 11.  Counsel's contradiction of this point is especially striking given that Grice's view is readily supported by the record.  MTA Sergeant Heagle testified that he would not have made the arrest had "McVeigh originally saw [Grice] in a non-trespassing area."  JA 520.

6

**III**

Turning to the merits, I agree that McVeigh had sufficient suspicion for a *Terry* stop and, indeed, he would have been derelict had he not inquired as to what Grice may have been doing. But Grice's detention was not a *Terry* stop, but an arrest. A *Terry* stop consists of a police officer's brief detention of an individual for questioning when that officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *U.S. v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (internal quotation marks omitted). In comparison to an arrest, a *Terry* stop "is an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *Id.* (internal quotation marks omitted). A *Terry* stop must be as minimally intrusive as possible, bearing in mind the circumstances that gave rise to the suspicion. *U.S. v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).

In certain situations, a *Terry* stop ripens into an arrest. Under the law of this Circuit, the following factors determine whether that occurs:

> the amount of force used by the police, the need for such, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

*U.S. v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004). Handcuffing is especially important. It is well settled that handcuffs are a hallmark of a formal arrest. *New York v. Quarles*, 467 U.S. 649, 655 (1984); *U.S. v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004); *see also U.S. v. Polanco*, 2011 WL 240140, at *7 (S.D.N.Y. Jan. 19, 2011) (handcuffing is "a maximal intrusion under the Fourth Amendment" (citing *U.S. v. Ceballos*, 654 F.2d 180–81, 184 (2d Cir. 1981)). Because every one of these factors points to an arrest and not to a *Terry* stop, I easily conclude that Grice was arrested.

7

The cases on which the majority relies to establish that Grice's detention was a simple *Terry* stop, rather than an arrest, despite his lengthy handcuffing are far off point. In *Newton*, a Fifth Amendment case, police officers responded to a specific "report that Newton illegally possessed a firearm and had recently threatened to kill his mother and her husband." 369 F.3d at 675. Given "such a volatile situation," we held that a "certainly brief" handcuffing that "last[ed] only the few minutes it took the officers to locate the sought-for firearm" did not constitute an arrest. *Id. Vargas* is similar. There, police officers responded to a report that Vargas was carrying a gun in his waistband. When the officers arrived on the scene and identified themselves, Vargas "immediately turned and fled." 369 F.3d at 100. The officers gave chase, and "[a]fter a brief struggle, [Vargas] was placed on the ground, handcuffed and patted down," a pat down which resulted in the officers quickly finding a loaded gun. *Id.* On appeal, we rejected Vargas' fanciful argument that he was under arrest during the "very brief" period between the placing of the handcuffs and the discovery of the weapon. Contrary to the majority's intimation, neither *Newton* nor *Vargas* stand for a broad exception that removes this case from our general rule that "handcuffs are generally recognized as a hallmark of a formal arrest." *Bailey*, 743 F.3d at 340.

The majority's reliance on *Tehrani*, *Newton* and *Vargas* to highlight that the length of the arrest was reasonable is similarly irrelevant to this case. After all, in determining the permissible time frame for a *Terry* stop, the Supreme Court has explained that "we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *U.S. v. Sharpe*, 470 U.S. 675, 686 (1985); *accord U.S. v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992); *see also U.S. v. McCargo*, 464 F.3d 192, 198–99 (2d Cir. 2006). Thus, where there has been "delay unnecessary to the legitimate investigation of the law enforcement

8

officers" then the detention cannot be justified under *Terry* and becomes a *de facto* arrest. *Sharpe*, 470 U.S. at 687. In the three cases cited above, the police had no alternate means of dispelling their suspicions without a lengthy detention. In contrast, here, had the officers simply agreed to look at the letter in Grice's bag after handcuffing him, their suspicions would have been dispelled almost immediately.

In the teeth of the myriad facts establishing that Grice was arrested, the majority maintains that it was a *Terry* stop. After acknowledging that "[h]andcuffing is ordinarily not incident to a Terry stop, and tends to show that a stop has ripened into an arrest," Op. at 10–11, the majority concludes that generalized terror concerns permit it to ignore the constitutionally grounded distinction between a *Terry* stop and an arrest. After all, the majority says, terrorists can "press a detonator button on any electronic device." Op. at 12.

The majority then proceeds to riff on this observation, listing instances of the use of cell phones by terrorists. *See* Op. at 15 n. 2. But if a generalized fear of terrorism coupled with the possession of a cell phone is sufficient to justify an arrest, then our Fourth Amendment is in real jeopardy. Practically every American now has a cell phone. As of 2017, there are more cell phones in America than Americans. Specifically, in a population of 326,776,164 there are 396,000,000 cell phones in use today or roughly 1.2 devices for every person in the country.[4] Our government is not entitled to use vague, unsubstantiated reports of disorder or terror to justify an arrest. That is why we have a Fourth Amendment.

In any event, the fact that some terrorists use cell phones is beside the point. McVeigh should have easily and quickly determined that Grice was a train buff, not a terrorist. As we have seen,

---

[4]CTIA - The Wireless Association, Everything Wireless, *Wireless Snapshot 2017* (2017), https://www.ctia.org/docs/default-source/default-document-library/ctia-wireless-snapshot.pdf.

9

Grice had on his person correspondence with the police corroborating his explanation of what he was doing.

Notwithstanding our law that handcuffing is the "hallmark of an arrest," the majority concludes that Grice's handcuffing did not constitute an arrest because "McVeigh's intent [was] to handcuff Grice for protection rather than pursuant to arrest." Op. at 12. None of this is correct. Because McVeigh lacked probable cause to arrest Grice, he had no legal right in these circumstances to handcuff Grice for Grice's protection. And because McVeigh had no basis whatever to believe that Grice was either armed or dangerous, he had no right to handcuff Grice for McVeigh's protection. Handcuffs are not a tool that police officers can casually use whenever they choose. Their use is not justified because it is a easy or convenient way for the police to go about their business. As our case law makes clear, handcuffing is a significant intrusion on a citizen's dignity and liberty.

The majority's reliance on "McVeigh's intent" is misplaced. Intent is irrelevant. Whether one is arrested is "an objective inquiry [that] pointedly eschews consideration of intent." *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (internal quotation marks omitted). Accordingly, McVeigh's "subjective intent does not calculate into the analysis of when [Grice was] arrested." *Vargas*, 369 F.3d at 101. Rather, "[t]he intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted." *Brendlin v. California*, 551 U.S. 249, 260–61 (2007); *see also Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Consequently, we do not ask on what subjective basis McVeigh actually handcuffed Grice, we ask whether there was an objectively "reasonable basis to think that [Grice] pose[d] a physical threat and that handcuffing [was] the least intrusive means to protect against that threat." *Bailey*, 743 F.3d at 340. The answer is, of course, no.

10

Nevertheless, the majority both improperly credits McVeigh and Farina's contention that they subjectively intended only to detain Grice for his protection and that they had an objectively reasonable concern for safety. McVeigh and Farina acknowledge that they detained Grice at least in part because they suspected he committed a crime, a fact *told to Grice* while he was handcuffed. As discussed, McVeigh testified that while Grice was handcuffed he became convinced that Grice posed no threat, but that he did not release him because he suspected Grice committed an unlawful trespass. Specifically, McVeigh was asked at deposition "why wasn't [Grice] let go . . . [a]t the point you determined he didn't do anything harmful[?]." JA 470. McVeigh responded: "We have him for criminal trespass." JA 470. Likewise, when Grice stated to Farina that he had done nothing wrong, Farina responded, "[y]ou're trespassing." JA 573. Thus it was *expressly* conveyed to Grice that he was being detained on suspected criminality, not for protection. The majority ignores this point entirely, yet it conclusively shows that, at the very least, Grice was under arrest (for trespass) at the point at which McVeigh had cleared Grice as any sort of danger to "my safety and your safety." JA 559. We should take McVeigh and Farina at their word: their basis for handcuffing Grice was not, as the majority asserts, for protection, but incident to Grice's arrest for trespassing.

More fundamentally, the facts we are obligated to accept demonstrate that there was never an objectively reasonable basis to view Grice as any sort of threat. This is especially so given the credible and quickly and easily verifiable explanation Grice provided for his presence and his conduct. In other words, McVeigh and Farina's highly generalized terrorism fear is a completely insufficient basis for dispensing with a showing of probable cause.

**IV**

The majority rests its opinion entirely on its conclusion that Grice was the subject of a valid *Terry* stop supported by reasonable suspicion. Because it concluded Grice was not arrested— a

11

necessary element of Grice's claims for false arrest, failure to intervene, and supervisory liability—it felt no need to assess whether McVeigh and Farina had probable cause, the other core question underlying Grice's claims. I need engage no prolonged discussion on this question because my views make clear that I would easily conclude that McVeigh and Farina lacked probable cause to arrest Grice. I would therefore send each of Grice's claims to a jury.

Grice's false arrest claim should survive because there was no probable cause to arrest Grice in relation to supposed train interference. And, even if there were, the claim would still lie because McVeigh and Farina continued their detention of Grice after they cleared him of any threat to the tracks. We have made clear that probable cause "dissipates" where "a police officer's awareness of the facts supporting a defense . . . eliminate[s] probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 135, 137–38 (2d Cir. 2003); *see also Gilles*, 511 F.3d at 247. Here, any justification for Grice's arrest was dissipated by the information provided McVeigh by the other officers.

I would also hold McVeigh and Farina to account for their role in the MTA's detention of Grice. I would do so for two reasons: (i) a police officer is liable for false arrest where, as here, it was reasonably foreseeable that his misconduct (*i.e.*, McVeigh's false report to the MTA) would "contribute to an 'independent' decision that results in a deprivation of liberty," *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007); *Kerman v. City of N.Y.*, 374 F.3d 93, 126–27 (2d Cir. 2004); and (ii) a failure to intervene claim lies where a "police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers," *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (internal quotation marks omitted). Finally, I would conclude that a triable question of fact remains as to whether Farina should be liable on a supervisory liability claim.

12

At a trial, McVeigh and Farina could well be exonerated by a jury that has been presented with the relevant facts. A jury could conclude that, given the circumstances the officers faced, they acted appropriately. Juries very frequently reach just this result. But where, as here, the record is pock-marked with contradictions, whether the officers are entitled to exoneration should be determined by a jury selected from the community the officers are committed to serve and not by judges dealing with a record such as this one.

For these reasons, I would affirm the district court.