JED S. RAKOFF, U.S.D.J.
Our Constitution does not allow police, acting on a hunch, to place people in handcuffs for prolonged periods of time - even if the hunch eventually pays off. Now before the Court are defendants' motions to suppress certain evidence that was obtained from them after they were handcuffed and detained for more than a half hour prior to the police having probable cause to arrest them. For the reasons below, *726 defendants' motions are granted in part and denied in part.
I. Findings of Fact
On December 14, 2018 and January 4, 2019, the Court held a suppression hearing at which the Government called four witnesses: New York Police Officer James Doheny, New York Police Officer William Smith, New York Police Lieutenant Alfred Reed, and New York Police Officer Joshua Thomas. Based on the Court's assessment of the witnesses' credibility (including demeanor) and consistency or inconsistency as detailed below, as well as the exhibits admitted in evidence, the Court makes the following findings of fact:
Around 11:40 PM on August 9, 2018, Doheny and Reed were driving westbound on 139th Street between Broadway and Riverside Drive when they heard shots being fired. Transcript dated December 14, 2018 at 6:11-17.[1] Doheny testified that he "saw a man wearing a black shirt with a firearm, and [he] saw a muzzle flash from the firearm when [he] heard a shot." Id. at 7:13-14. He then saw the shooter and another man run westbound down 139th Street. Id. at 8:9-10. Reed got out of the car and remained at the scene, while Doheny drove westbound down 139th in pursuit. Id. at 9:10-16; Gov't Ex. 402 at 00:32-00:44.
Immediately following the shooting, distress calls came over the department radio - from individuals other than Doheny and Reed - that there had been "shots fired" at "1-3-9 and Broadway." Gov't Ex. 101-T at 1:6-7, 12-13. As Doheny pursued the suspects, he also made several calls over the radio. First, Doheny said: "Riverside! They're running towards 12th...." Id. at 1:16-17. Then: "... with a black shirt. Ran down ... 138." Id. at 2:9-10. And finally: "I'm on 12 Avenue, he ran down 12 avenue .... I don't know which way they went from there." Id. at 2:21-22, 24-25. Shortly thereafter, the police dispatcher said over the radio: "It's a male black, wearing a black ...." Id. at 3:1. And then, after some intervening calls, the dispatcher asked: "Okay who are we lookin' for? Male black, wearing a black shirt?" Id. at 3:18-19.
Smith testified that he had just gotten into his police car when he heard the initial distress calls that there had been "shots fired" at "1-3-9 and Broadway." Transcript dated December 14, 2018 at 41:25-42:8. Smith testified that he responded to the calls by driving westbound on 126th Street, and that he turned north on Broadway and then west on 132nd Street when he heard Doheny's call that the suspects were running toward Riverside. Id. at 43:3-10.[2] Smith testified on direct examination that he heard "black sweatshirt, male, black sweatshirt" over the radio, id. at 43:14, but he acknowledged on cross-examination that he heard "male with a black shirt," id. at 56:13.[3] Smith testified that he did not *727 remember hearing the description of a "male black" that was put over the radio by the dispatcher. Id. at 58:7-10.
Smith soon arrived at West 135th Street and 12th Avenue, at which point he got out of his car and saw the person later identified as defendant Richie Hilario running southbound toward him on 12th. Id. at 43:17-44:19. Hilario, who is Hispanic, was wearing a black hooded sweatshirt with a red shirt and black shorts. Id. at 67:23-24, 71:20. Smith stopped Hilario, placed him in handcuffs, and frisked him. Id. at 44:21-23. Smith also made an announcement over the police radio that he had "one male stopped at 1-3-5 and 12th avenue." Gov't Ex. 101-T at 3:23-24.
As Smith was frisking Hilario, he saw the person later identified as co-defendant Kenny Pena approaching him from the same direction that Hilario had come. Transcript dated December 14, 2018 at 44:21-25.[4] Pena, who is also Hispanic, was wearing a black Pittsburgh Pirates jersey with large gold lettering and jean shorts. Id. at 74:23-25; Gov't Ex. 301 at 00:00-00:10. Another New York Police Officer, referred to at the hearing as Officer Ross, placed Pena in handcuffs. Transcript dated December 14, 2018 at 75:9-10. Based on the timestamp on Smith's body camera, Pena was handcuffed a little after 11:44 PM, Gov't Ex. 301 at 00:00-00:30, and Hilario was likely handcuffed shortly before that. Smith testified that he did not place either suspect under arrest. Transcript dated December 14, 2018 at 49:11-12.
Smith did not find anything on Hilario when he frisked him. Id. at 49:8-10. However, roughly six minutes into Smith's body camera footage, Hilario is visible and can be heard asking, unprompted, for his money, which appears to be on the hood of a police car. Hilario says that Smith previously told him to drop the money. Smith asks Hilario how much it is, and Hilario says $120. Smith then confirms the money's location with another officer. See Gov't Ex. 301 at 06:00-06:30.
At the same time that Ross was handcuffing Pena, Thomas arrived at 135th and 12th. Transcript dated January 4, 2019 at 123:19-21. Thomas testified that he assisted Ross and then briefly searched Pena, taking a wallet and money from Pena's pockets. Id. at 135:8-13, 136:19-23.[5] Later, after Pena had been detained for approximately fifty minutes, Thomas conducted a second search and found a tissue containing drugs and a sock containing a loose bullet. Gov't Ex. 302 at 12:00-13:20; 15:10-15:25; Transcript dated January 4, 2019 at 140:3-13.
As the above events were unfolding, Reed was still on 139th Street, gathering evidence from the shooting. Transcript dated December 14, 2018 at 88:5-25. Shortly after the shooting took place, Reed was able to find and view video footage from a nearby surveillance camera, introduced as Government Exhibit 401. Id. at 89:1-93:1. The video depicts the following events: a group of people are sitting on the steps of a building, when two men approach. One *728 man appears to be wearing a light-colored hat, light-colored shoes, a dark-colored sweatshirt, and dark-colored shorts. The other appears to be wearing a dark-colored hat, dark-colored shoes, a dark-colored sweatshirt, and medium-colored shorts. The man with the dark-colored hat brandishes a gun, which he then appears to fire several times. The man with the light-colored hat then appears to grab something off the ground, and both men run westbound down 139th.
After viewing the video, Reed put the following call over the police radio: "[M]ale Hispanic, black hoodie, blue shorts,[6] and he looks like he has on black sneakers with no socks on.... Light-skin Hispanic male.... Backpack, looks like there's writing in the back." Gov't Ex. 101-T at 12:18-21, 13:7-8. Based on the timestamps on the audio of the police radio run, this announcement was made about twenty minutes after Smith announced that he had "one male stopped at 1-3-5 and 12th avenue." Gov't Ex. 101 at 03:15-03:21, 22:45-23:03.[7]
Reed then went to 135th and 12th, where he identified Pena and Hilario as the two men he had seen in the video, and he placed them under arrest. Transcript dated December 14, 2018 at 95:10-96:14. Based on Smith's body camera footage, Reed was present at 135th and 12th as early as 12:18 AM. Gov't Ex. 301 at 33:45. Thus, although it is unclear exactly when he placed defendants under arrest, it was at least thirty-four minutes after they had been detained and handcuffed (Pena at 11:44 PM and Hilario slightly earlier, Gov't Ex. 301 at 00:00-00:30). It should also be noted that for almost the entirety of this more than half-hour period, there were multiple police officers and police cars at the scene of the detention. See generally Gov't Ex. 301.
On September 5, Pena and Hilario were indicted for possessing a firearm, which was discharged, in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. §§ 92 4(c)(1)(A)(i)-(iii), (2). ECF No. 13. The defendants were arraigned on September 17, at which time both defendants entered pleas of not guilty. ECF No. 16, at 2:23-3:3. On October 15, Hilario filed a motion to suppress all physical evidence obtained from his person, "including but not limited to sneakers, clothing, and United States Currency," as well as any "statements made to Law Enforcement," ECF No. 18, at ¶¶ 1-2, including not only statements made while he was detained at 135th and 12th, but also statements made when he was questioned at the precinct later in the day, ECF No. 19, at SI 6. On October 16, Pena filed a motion to suppress all physical evidence taken from his person, including but not limited to his wallet and money, and the sock, drugs, and bullet described above. ECF No. 23, at 5.
II. Discussion
"The Fourth Amendment protects persons against unreasonable searches and seizures. Evidence seized pursuant to an unreasonable search or seizure or evidence that is the fruit of an unreasonable search or seizure must be suppressed and cannot be used in the prosecution's case in chief." United States v. McCargo, 464 F.3d 192, 196 (2d Cir. 2006).[8] "While searches and seizures conducted *729 without a warrant are presumptively unreasonable, several exceptions to the warrant requirement have been fashioned when circumstances demand an immediate police response." Id."One such exception is a search incident to a valid arrest supported by probable cause." United States v. Nelson, No. 10 Cr. 414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011).
"An officer has probable cause to arrest where he is in possession of reasonably trustworthy information concerning facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." United States v. Pabon, 871 F.3d 164, 174 (2d Cir. 2017). "This standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." Id.
Even where an officer lacks probable cause to arrest, she "may briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." United States v. Padilla, 548 F.3d 179, 186 (2d Cir. 2008) (emphasis added). "[T]he amount of suspicion needed to justify the encounter is less than a fair probability of wrongdoing, and considerably less than proof of wrongdoing by a preponderance of the evidence." Id. at 186-87. Instead, when "reviewing reasonable suspicion determinations, we look to the totality of the circumstances to see whether the officer had a particularized and objective basis to suspect criminal activity." Id. at 187.
Nevertheless, if such a stop "continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause." United States v. Glover, 957 F.2d 1004, 1011 (2d Cir. 1992). "When a court considers a claim of de facto arrest, the following facts are generally deemed relevant: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." United States v. Fiseku, No. 17-1222-cr, --- F.3d ----, ----, 2018 WL 6605855, at *5 (2d Cir. Dec. 17, 2018). "No one of these factors is determinative. But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004).
In the instant case, the Government argues that the officers had probable cause to arrest Pena and Hilario when the defendants were initially stopped. Transcript dated January 4, 2019 at 144:16-18. Given that Doheny reported both a direction of flight for the suspects (that they were running south on 12th avenue) and an article of clothing (a black shirt) that matched Pena and Hilario, the Government argues that Smith (and the other officers present) had "knowledge of facts and circumstances that warrant[ed] a person of reasonable caution to believe that an offense ha[d] been committed by" defendants at the time they were first detained. Id. at 146:8-16.
Furthermore, the Government argues, even if the officers did not have probable cause at the time defendants were first detained, they did have reasonable suspicion to stop Pena and Hilario while the investigation continued. Id. at 149:9-18. The Government argues that defendants' detention did not ripen into an arrest during *730 the approximately thirty-four minutes between the time that defendants were handcuffed and the time that Reed identified them. Id. at 151:2-21.[9] Specifically, the Government argues that the use of handcuffs and the number of officers were justified based on the risk of flight that defendants presented and the fact that officers were still looking for a firearm from the shooting. Id. at 152:13-154:21. Given these considerations, the Government argues, defendants' detention had not ripened into an arrest at the time Reed arrived, and once Reed identified Pena and Hilario from the surveillance video, there was probable cause to arrest them. Id. at 155:9-10.
The Court agrees with the Government that the officers had reasonable suspicion to stop defendants, and counsel for Pena effectively conceded the same at the hearing. Id. at 157:17-19. "Reasonable suspicion is not a high threshold," United States v. Lawes, 292 F.3d 123, 127 (2d Cir. 2002), and the description Doheny put over the police radio regarding the suspects' path of flight was probably enough by itself to stop defendants as they ran down 12th Avenue.
The Court does not agree, however, that the officers had probable cause when they initially detained Pena and Hilario. It is true that "[a] finding of probable cause does not require a prima facie showing of criminal activity or demonstration that it is more probable than not that a crime has been or is being committed." United States v. Henderson, 122 F. App'x 535, 537 (2d Cir. 2005). However, "the probable cause standard is not entirely toothless," and while "police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir. 1988).
Smith testified that he did not regard his initial detention and handcuffing of Hilario as an arrest. Transcript dated December 14, 2018 at 49:11-18. At the time that Smith stopped Hilario, there had been radio announcements that shots were fired at 139th and Broadway, Gov't Ex. 101-T at 1:6-13, that "they" were running toward 12th from Riverside, id. at 1:16-18, and that someone was wearing a black shirt, id. at 2:9-11. There had also been announcements, however, that "he ran down 12 avenue," id. at 2:21-22, that the direction of flight thereafter was unknown, id. at 2:24-25, and that the suspect was a black male, id. at 3:1.
Smith testified that he stopped Pena and Hilario because "they fit the description that [he] heard over the radio and they were in the vicinity of the direction that the officer had put over the radio." Transcript dated December 14, 2018 at 45:8-11. But Pena and Hilario are not black. And defendants can be described only imprecisely as wearing black shirts at the time they were detained. Hilario was wearing a red shirt and a black sweatshirt, while Pena was wearing a black Pirates jersey covered in large gold letters. Although Smith testified that he did not remember hearing the description of a "male black" that was put over the radio by the dispatcher, id. at 58:7-10, the Court does not credit this testimony, as Smith demonstrated a tendency on more than one occasion to conform his recollection of the radio transmission to later-learned information, *731 see id. at 57:17-18 (writing a statement the night of the incident that he had heard a radio transmission about "[t]wo male Hispanics with hoodies that fled westbound towards RFD"); id. at 43:14 (testifying on direct examination that he had heard "black sweatshirt, male, black sweatshirt").
Furthermore, after defendants were initially detained, a series of additional announcements came over the police radio that largely cast doubt on the conclusion that Pena and Hilario were the suspects. First, the police dispatcher said, "in regards to 6-0-2 West 1-3-9 female states that male Hispanic wearing a light blue shirt with a gun." Gov't Ex. 101-T at 5:1-3. Neither defendant was wearing a blue shirt. Shortly thereafter, an unidentified individual said, "multiple witness, we're looking for two males runnin' masked. They ran into the Park on River[UI] and 1-3-9 towards 12th avenue." Id. at 5:6-9. Neither defendant was wearing a mask. And later, the dispatcher said, "2 male Hispanics, 1 male Hispanic light skin, slender, wearing a hat, beige khaki pants with pockets, early 20s, about 5'6", wearing black hoodie with a grey hat." Id. at 8:11-14. Neither defendant was wearing khaki pants. Even after Reed viewed the surveillance video, the description he put over the radio - a male Hispanic with a black hoodie, blue shorts, black sneakers, and a backpack with writing on it, id. at 12:18-21, 13:7-8 - was not fully consistent with either defendant.
In light of these considerations, the Court finds that the police lacked probable cause to arrest Pena and Hilario at the time that they were initially detained. The Court's inquiry does not end there, however, as the Government argues, and the Court agrees, that there was probable cause to arrest defendants once Reed arrived and identified them from the surveillance video. As already noted, moreover, it is uncontested that the police had a sufficient basis to stop and question the defendants when they were initially detained. The question then is whether their detention became an unlawful de facto arrest before Reed arrived.
As discussed above, an investigatory stop will ripen into a de facto arrest if it "continues too long or becomes unreasonably intrusive." Glover, 957 F.2d at 1011. The use of handcuffs in particular "tends to show that a stop has ripened into an arrest," although "a police officer, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017). Given these safety considerations, the Second Circuit has recognized that, "[i]n certain unusual circumstances, ... handcuffing a suspect to investigate a reasonable suspicion does not transform a ... stop into an arrest." Id. at 167-68.
At the hearing, the Government argued that the use of handcuffs was justified by "legitimate safety concerns" and defendants' "risk of flight." Transcript dated January 4, 2019 at 152:17-19. In support of its position, the Government cited several cases in which the Second Circuit has held that the use of handcuffs does not necessarily transform an investigatory-stop into an arrest. Of particular note are the Second Circuit's recent decisions in United States v. Fiseku, No. 17-1222-cr, --- F.3d ----, 2018 WL 6605855 (2d Cir. Dec. 17, 2018), and Grice v. McVeigh, 873 F.3d 162 (2d Cir. 2017).
In Fiseku, an officer followed a vehicle into a parking lot after watching the driver engage in suspicious behavior. --- F.3d at ----, 2018 WL 6605855 at *1. After observing three men in or near the vehicle, *732 the officer and two backup officers frisked and handcuffed the suspects. Id. at ---- - ----, at *1-2. Ten minutes later, after searching the vehicle with the consent of one of the suspects, the officers found weapons and other suspicious equipment. Id. at ---- - ----, at *2-3. The Second Circuit held that the "case present[ed] 'unusual circumstances,' " and that the initial use of handcuffs did not convert the stop into an arrest because the suspects might have recovered weapons from the car and because the officers could not have conducted a perimeter sweep while monitoring the suspects. Id. at ---- - ----, at *5-6. Furthermore, the court held, the stop did not ripen into an arrest during the ten minutes the suspects were handcuffed because the officers were diligent in questioning the suspects and searching the car. Id. at ---- - ----, at *7-8.
Grice presented more colorful facts. Grice, "a 16 year old train enthusiast, was stopped and handcuffed after the [local police] received a 911 report that someone holding an electronic device was bending down by the tracks at a rail crossing." 873 F.3d at 164-65. It turned out that Grice was "lawfully watching trains" with a phone and a radio scanner, but he was handcuffed for thirty-three minutes while officers and a dog searched the tracks for a bomb. Id. at 165-66. The Second Circuit held that Grice's "circumstances can easily be classified as unusual," id. at 168, and that the stop did not ripen into an arrest because the detaining officer was alone at the time he handcuffed Grice (although several other officers arrived shortly thereafter), and because handcuffing was necessary "to ensure that Grice could not press a detonator button on any electronic device until the tracks could be searched," id.
Fiseku and Grice provide helpful comparators to the instant case (in part because Grice was handcuffed for thirty-three minutes, which is nearly the same amount of time that Pena and Hilario were restrained prior to Reed's arrival). Unlike in Fiseku and Grice, however, Pena and Hilario were not detained by only one or a few officers. To the contrary, soon after Pena and Hilario were restrained, Smith's body camera footage shows at least ten police officers present. Gov't Ex. 301, at 1:00-2:00. And unlike in Fiseku and Grice, handcuffing Pena and Hilario was not necessary to address a discrete security threat, like a car containing weapons or a track wired with explosives. Both defendants were frisked and found to be unarmed. Transcript dated December 14, 2018 at 49:8-10; Transcript dated January 4, 2019 at 124:9-19, 125:15-126:13.
Instead, the Government seeks to justify defendants' restraint based on a generalized "risk of danger and weapons" and "demonstrable risk of flight." Transcript dated January 4, 2019 at 154:3-7. But these risks were sufficiently reduced once the officers frisked and outnumbered defendants, at which point a half hour of detention with handcuffs ceased to be "the least intrusive means reasonably available to effect [the officers'] legitimate investigative purposes." Newton, 369 F.3d at 674.
Finally, the Government argues that the stop did not ripen into an arrest because the officers "were diligently pursuing their investigation" while defendants were detained. Transcript dated January 4, 2019 at 151:13-21. But unlike in Grice and Fiseku, the prospective length of defendants' detention was wholly indeterminate at the outset. It is true that Reed ultimately succeeded in finding video footage of the shooting, but he might not have. And the Government concedes that the question of whether a stop has ripened into an arrest does not turn on "whether it was 20 minutes or 30 minutes or 40 minutes or 50 *733 minutes." Id. at 151:12-13. Without any limiting principle, the Government's theory allows for indefinite restraint on reasonable suspicion, so long as the crime being investigated involves a dangerous weapon.
In short, the instant case is not sufficiently "unusual" to justify a departure from the rule that "[h]andcuffs are generally recognized as a hallmark of a formal arrest." Newton, 369 F.3d at 676. And even if the officers' initial use of handcuffs did not "automatically render[ ] [defendants'] stop an arrest," United States v. Bailey, 743 F.3d 322, 340 (2d Cir. 2014), the Court concludes based on the length of defendants' detention and the number of officers present that the stop ripened into an arrest prior to Reed's arrival at the scene.
Accordingly, the Court holds that defendants' arrest was unlawful and that all physical evidence recovered from defendants must be suppressed. The Court also holds that Hilario's statements at the precinct must be suppressed, as the Government has offered no evidence that the statements were sufficiently attenuated from Hilario's unlawful arrest. See United States v. Ghailani, 743 F.Supp.2d 242, 259 (S.D.N.Y. 2010) ("[T]he burden of proof on the attenuation claim is on the government ...."); United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) ("The government bears the burden of proving that the taint has been alleviated."). However, the Court will not require the suppression of Hilario's statements regarding the $120 or the suppression of the $120 itself. These statements were volunteered spontaneously, and the money was not taken from Hilario's person.
III. Conclusion
In sum, Pena's motion to suppress is hereby granted, and Hilario's motion to suppress is hereby granted in part and denied in part. Both motions are granted insofar as they seek to suppress physical evidence obtained from defendants, except that Hilario's motion to suppress the $120 is denied. Hilario's motion to suppress his statements relating to the $120 is similarly denied, but Hilario's motion to suppress statements made at the precinct is granted.
The Clerk is directed to close the entries at docket numbers 18 and 23.
SO ORDERED.

Although the testimony at the suppression hearing indicated that the shots were fired around 11:50 PM, timestamps from contemporaneous video footage indicate that it was closer to 11:40 PM. See Gov't Ex. 402 at 00:00-01:00 (surveillance video footage indicating that shots were fired shortly after 11:38 PM); Gov't Ex. 301 at 00:00-00:30 (body camera footage from Smith indicating that Pena was detained shortly after 11:44 PM and that Hilario had already been detained at that time).

Smith testified that he did not recognize Doheny's voice when he heard it on the evening of August 9. Transcript dated December 14, 2018 at 64:1-12.

The night that defendants were arrested, Smith wrote a statement that he initially heard "[t]wo male Hispanics with hoodies that fled westbound towards RFD." Id. at 57:17-18. Smith acknowledged at the suppression hearing that this description was not accurate. Id. at 57:21-23.

Smith initially testified on direct that he saw Pena running, id. at 44:24-25, but he later testified on cross that he saw Pena walking, id. at 74:16-22. Smith's body camera footage shows Pena walking, Gov't Ex. 301 at 00:00-00:10, although it is possible that Pena had previously been running, as Smith's body camera footage does not begin until after Smith handcuffed Hilario, Transcript dated December 14, 2018 at 58:18-59:13.

Thomas testified on direct that he recovered a wallet, a cell phone, money, and a sock when he searched Pena. Transcript dated January 4, 2019 at 124:9-14. On cross, however, Thomas acknowledged that he took only Pena's wallet and money during his initial search. Id. at 135:8-13, 136:19-23.

At the hearing, Reed testified that he viewed the surveillance video in black and white. Transcript dated December 14, 2018 at 105:9-12.

The twenty-minute lag is also corroborated by Smith's body camera footage, in which Reed's announcement can be heard. Gov't Ex. 301 at 19:20-19:40.

Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, footnotes, and citations are omitted.

It is unclear from the body camera footage when exactly Reed identified Pena and Hilario. However, Reed does appear at 135th and 12th as early as 12:18 AM, Gov't Ex. 301 at 33:45, which was approximately thirty-four minutes after Pena was handcuffed, and slightly longer after Hilario was handcuffed.